95 F.3d 1461
 71 Fair Empl.Prac.Cas. (BNA) 1849,
69 Empl. Prac. Dec. P 44,367,
45 Fed. R. Evid. Serv. 611,
96 Cal. Daily Op. Serv. 7003,
96 Daily Journal D.A.R. 11,490
Kwasi OPUKU-BOATENG, Plaintiff-Appellant,
v.
STATE OF CALIFORNIA; Clare Berryhill; Mimi Khan; Gloria
Harmon, Defendants-Appellees.
 No. 94-16542.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 8, 1995.
Decided Sept. 19, 1996.
As Amended Nov. 19, 1996.
 
 Lee Boothby, Boothby & Yingst, Berrien Springs, Michigan, for plaintiff-appellant.
 Charles W. Getz, Deputy Attorney General, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California, Milton L. Schwartz, District Judge, Presiding. D.C. No. CV S-87-755-MLS.
 Before: REINHARDT and BOOCHEVER, Circuit Judges, and KING, District Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 This is a case involving an employer's obligation to accommodate a worker's religious beliefs and, in particular, the commitment to observe the Sabbath. Kwasi Opuku-Boateng, a temporary employee of the California Department of Food and Agriculture ("the Department"), sought permanent employment with the Department. He was selected for a permanent position but, when he advised the Department that he was unable to work on Saturdays because of his religious beliefs, the Department terminated the hiring process. Opuku-Boateng sued the State of California and several Department officials ("the State"), claiming that the State denied him a position on the basis of his religion, in violation of Title VII of the Civil Rights Act of 1964. He sought reinstatement of employment and benefits, back pay, and reasonable attorney's fees and costs, as well as declaratory and injunctive relief. The district court concluded that Opuku-Boateng had established a prima facie case of discrimination but that the State had demonstrated that accommodating his religious beliefs would have caused undue hardship. Accordingly, it entered judgment in favor of the State. We reverse.
 
 BACKGROUND
 
 2
 Opuku-Boateng is a devout member of the Seventh Day Adventist Church. The Church teaches its members to observe the Sabbath from sundown Friday to sundown Saturday and to refrain from engaging in secular work during that period. It further teaches that repeated violations of the Sabbath observance imperil one's salvation. Opuku-Boateng, adhering to the tenets of his faith, and concerned about his ultimate salvation, observes the Sabbath. Indeed, as the district court noted, he has never worked on the Sabbath and refuses to do so under any circumstances.
 
 
 3
 During the summer of 1982, Opuku-Boateng, who held a temporary position as a Grain Inspector for the Department, sought some form of permanent position.[1] He applied for numerous positions, including Plant Quarantine Inspector ("Plant Inspector").[2] The Plant Inspector application asked the applicant to indicate if his religious beliefs prevented him from sitting for the examination on Saturdays. Despite having answered the question affirmatively, Opuku-Boateng received a notice that he was scheduled to take the examination on that day. Upon receiving the notice, he immediately called the listed contact person, Diane Sheff, who made arrangements for him to take the test on a Sunday.
 
 
 4
 During the interview, Opuku-Boateng and the interviewers, Sheff and Chuck Gray, discussed neither the subject of working hours nor of Opuku-Boateng's religious beliefs. Having previously indicated that he could not take the examination on his Sabbath, and having made arrangements to take it on a Sunday instead, Opuku-Boateng assumed that Sheff and the Department knew of his inability to work on Saturdays. Following the interview, Opuku-Boateng spoke by telephone with Gray on at least one occasion. Gray asked whether he had a preference for any particular station, and he responded that any station would be acceptable. When Gray cautioned that certain stations had less desirable living accommodations than others, he stated that his only concern was whether the station would be near an Adventist church.
 
 
 5
 On October 18, 1982, Opuku-Boateng received an appointment as a Plant Inspector to the border-inspection station in Yermo, California, to begin on November 2. The Yermo station employed a total of 15 inspectors, including 5 supervisors. It operated seven days a week, twenty-four hours a day, and maintained three eight-hour shifts--day, evening, and night. The size of the staff and the number of shifts would increase, however, during certain times of the year, such as the summer months. Departmental policy required that work assignments be made as equitably as possible. As the district court found, all employees at the Yermo station were required to work "an equal number of undesirable weekend, holiday, and night shifts." Departmental policy further required that employees be assigned varying schedules to avoid the possibility of collusion between inspectors and "the travelling public or trucking industry," and to expose inspectors to the various commodities that were transported through the station at different times.
 
 
 6
 After being selected for the permanent position, Opuku-Boateng terminated his temporary employment, and moved his family to Yermo. On October 28, Opuku-Boateng visited the station, accompanied by the local Adventist pastor. He reviewed the posted work schedule and learned that he was scheduled to work on an upcoming Saturday, November 14. He informed the acting supervisor, William Whitacre, that his religious beliefs precluded him from working on his Sabbath. Whitacre advised Opuku-Boateng that unless he was willing to work on Saturdays, his appointment would not be processed. Opuku-Boateng left the station and immediately telephoned Charles Gray, whose name was listed on the appointment letter, to inform him of the problem. Gray initially agreed with Whitacre's assessment, indicating that it would be necessary for Opuku-Boateng to work Saturdays, but later said that he would have to discuss the matter with his superiors.
 
 
 7
 Over the next week, Opuku-Boateng and representatives of the local Adventist parish negotiated with various Department representatives in an attempt to find a solution. Opuku-Boateng offered to work undesirable non-Sabbath shifts (i.e., Sundays, nights and holidays) in place of the Sabbath assignments he would ordinarily receive; to trade shifts with other employees; or to transfer to another station or another position within the Department. At some undetermined point, Howard Ingham, a Program Supervisor for the Department, instructed a supervisor in the Yermo station, whose identity he no longer recalls, to conduct a poll of the staff to determine whether voluntary trading of shifts to accommodate Opuku-Boateng would be feasible.[3] According to the district court, "[a]lthough one or two employees said they would be willing to do so on rare occasions, none were willing to accommodate [Opuku-Boateng] permanently."[4]
 
 
 8
 By letter dated November 1, Ingham informed Opuku-Boateng that his request for an accommodation had been reviewed. Ingham noted that the Plant Inspector examination announcement specified "[w]illingness to work holidays, Sundays, and odd hours" and that "[t]he workload at the border stations is heaviest during the weekend period...." Because "[m]ost employees want as many weekends off as possible," he stated that it was most difficult to schedule shifts to provide "for adequate coverage." He concluded that "the request of wanting two specific days off each week" was not considered reasonable,[5] and advised Opuku-Boateng that if he wanted to be employed as a Plant Inspector, he would be "expected to work assigned shifts as scheduled."
 
 
 9
 On November 3, Claude Morgan, an attorney for the Church State Council, filed a complaint with the State Personnel Board, claiming violations of state and federal law. Morgan stated that Opuku-Boateng's religious beliefs could be accommodated and that he had proposed various feasible accommodations, such as providing a "temporary schedule adjustment pending development of a satisfactory accommodation, asking the cooperation and assistance of the appropriate labor union and arranging a schedule adjustment,[6] surveying employees to request their cooperation in developing an accommodation, and [providing] an immediate leave of absence to allow location of opportunities for transfer." He stated, however, that Department representatives had repeatedly refused to accept any of these proposed accommodations or to explore any other alternatives.
 
 
 10
 On November 8, Ingham informed Opuku-Boateng that the appointment would not be made. He stated that since Opuku-Boateng could not be "available to work frequently from Friday sundown through Saturday sundown," the appointment process would be terminated.
 
 
 11
 Opuku-Boateng filed a complaint with the Equal Employment Opportunity Commission. The District Director determined that the Department "made absolutely no attempts to consider any accommodation." It concluded that there was reasonable cause to believe that the Department had violated Title VII by refusing to hire Opuku-Boateng. After he exhausted his administrative remedies, the Commission issued him a right-to-sue letter.
 
 
 12
 Opuku-Boateng filed an action claiming that the denial of his appointment violated Title VII. Following trial, the district court entered judgment in favor of the State. It concluded that although Opuku-Boateng established a prima facie case of religious discrimination, the State had demonstrated that it could not reasonably have accommodated his religious beliefs without suffering undue hardship.
 
 DISCUSSION
 
 13
 Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating on the basis of religion.[7] It defines the term "religion" to include "all aspects of religious observance and practice, as well as belief," and imposes a duty of reasonable accommodation on employers. 42 U.S.C. § 2000e(j).[8] It is therefore unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271-72, 53 L.Ed.2d 113 (1977).
 
 
 14
 We assess Title VII religious discrimination claims using a two-part analysis. Heller v. EBB Auto Co., 8 F.3d 1433, 1438 (9th Cir.1993). First, the employee must establish a prima facie case of religious discrimination. Id.[9] Second, if the employee does so, the burden shifts to the employer to show that it " 'negotiate[d] with the employee in an effort reasonably to accommodate the employee's religious beliefs.' " Id. (quoting EEOC v. Hacienda Hotel, 881 F.2d 1504, 1513 (9th Cir.1989)). Where the negotiations do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so. EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 615 (9th Cir.1988), cert. denied, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). Only if the employer can show that no accommodation would be possible without undue hardship is it excused from taking the necessary steps to accommodate the employee's religious beliefs. See Heller, 8 F.3d at 1440; Townley Eng'g, 859 F.2d at 615.
 
 Prima Facie Case
 
 15
 The State concedes that Opuku-Boateng established a prima facie case of discrimination. First, he established that observance of his Sabbath is a bona fide religious practice and that it conflicts with the employment duty to be available to work on Saturdays. Second, he demonstrated that he notified the State upon learning of the conflict between his religious beliefs and the employment duty. Last, he proved that the failure to hire him was a result of the conflict.[10]Reasonable Accommodation and Undue Hardship
 
 
 16
 Because Opuku-Boateng established a prima facie case of discrimination, the State was required to establish that it did not violate the statutory duty to accommodate his observance of the Sabbath. We review for clear error the district court's determination whether an employer has violated its statutory obligation to make good-faith efforts to negotiate an accommodation of an employee's religious beliefs, see Hacienda Hotel, 881 F.2d at 1512-13, as well as its determination whether an employer could make a reasonable accommodation without incurring undue hardship, Yott v. North American Rockwell Corp., 602 F.2d 904, 908 (9th Cir.1979).
 
 
 17
 Whether a proposed accommodation would cause undue hardship must be determined in the particular factual context of the case. See American Postal Workers Union v. Postmaster Gen., 781 F.2d 772, 775 (9th Cir.1986). Ordinarily, the employer must show that the accommodation would cause " 'undue hardship on the conduct of the business.' " Townley Eng'g, 859 F.2d at 615 (quoting 42 U.S.C. § 2000e(j)). "An accommodation causes an 'undue hardship' when it results in more than a de minimis cost to the employer." Heller, 8 F.3d at 1440.[11] However, an employer may also show hardship on the plaintiff's coworkers. It is less clear what type of impact on coworkers, apart from a significant discriminatory impact, constitutes an undue hardship.[12]
 
 
 18
 Here, the district court concluded that the State entered into good-faith negotiations for the purpose of arriving at an accommodation of Opuku-Boateng's religious beliefs. The court based its conclusion on the fact that the State engaged in negotiations with Opuku-Boateng's representatives and conducted a poll of the Yermo station employees before determining that an accommodation was not feasible. Without relying on the evidence regarding the poll,[13] we agree that the State " 'negotiate[d] with the employee in an effort reasonably to accommodate the employee's religious beliefs.' " Heller, 8 F.3d at 1438 (citation omitted). This is clearly not a case in which the employer did not make an effort to negotiate with the employee. See id. at 1440 (collecting cases in which employer made no effort). Indeed, it appears that as a result of week-long negotiations, a church elder arrived at a tentative agreement with the State but that the arrangement later fell through. While the nature of the understanding has been lost with the death of the elder and the failure of the state, for whatever reason, to produce a witness from its side of the discussions, we nevertheless conclude that the State satisfied the first requirement. The threshold for satisfying this requirement is low because, while a negative conclusion results in a violation of the statute, an affirmative conclusion serves only to move the analysis to the next issue: whether the various potential accommodations would all have resulted in undue hardship.
 
 
 19
 Although the State negotiated in good faith, there is no evidence that it ever made any proposal to Opuku-Boateng. Therefore, the next issue is whether Opuku-Boateng's proposed accommodations would have resulted in undue hardship to the State or his co-workers. As we have noted, the proposed accommodations included excusing him from Sabbath work and scheduling him instead for other equally undesirable shifts, adopting a system of voluntary or mandatory shift trades, employing a combination of the above procedures, arranging a transfer to another department, and making a temporary accommodation, which would have allowed the State to experiment with the various proposals while permitting both it and Opuku-Boateng to make efforts to find him other employment with the Department or another State agency. The district court rejected all of these proposed accommodations on the ground that each would have resulted in undue hardship both to his coworkers and the Department. We address the district court's conclusions as to the proposed accommodations in turn.
 
 Scheduling Arrangement and/or Shift Trades
 
 20
 The district court concluded that although scheduling Opuku-Boateng to be off every Sabbath was mathematically possible, it constituted an unreasonable accommodation "because it would have had a discriminatory impact on other employees and more than a de minimis impact on the operation of the Yermo station." Specifically, the district court determined that accommodating Opuku-Boateng in this manner would have required a number of other employees to work more than their fair share of Friday night and Saturday day and evening shifts, hampered the Department's ability to accommodate other employees' scheduling needs, resulted in substantial morale problems and additional requests for accommodations, and violated Departmental policy. With respect to a system of voluntary shift trades, which could have been employed either by itself or in combination with modifications to the scheduling system, the district court concluded that any such arrangement was infeasible because the other station employees were unwilling to trade shifts with Opuku-Boateng on a regular basis.
 
 
 21
 We conclude that the district court clearly erred in determining that the State established that Opuku-Boateng's proposed accommodations would cause undue hardship; it erred with respect to the purported impact both on Opuku-Boateng's fellow station employees and on the Department's operations. We discuss first the impact on the other employees. We conclude that the State failed to establish that (1) a scheduling arrangement that would have allowed Opuku-Boateng to observe the Sabbath would have discriminated against the other station employees, and (2) a voluntary trade system would have been infeasible.
 
 
 22
 In determining that the proposed accommodations would result in discriminatory treatment of other employees, the court relied principally on Trans World Airlines v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). We have not read Hardison so broadly as to proscribe all differences in treatment. Compare Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1243 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981) ("Disparate treatment of employees ... is not necessarily unreasonable.") with Yott, 602 F.2d at 908 (stating that "transferring and training Yott appears to constitute preferential treatment over other bargaining unit employees of a substantial nature, contrary to [Hardison ]....").[14] Instead, we have read it to bar "preferential treatment of employees." Tooley, 648 F.2d at 1243.
 
 
 23
 In Hardison, the proposed accommodation would have conflicted with the contractually-established seniority system, thus violating an employee's seniority rights under the collective bargaining agreement by denying him his shift preferences. Hardison, 432 U.S. at 80, 97 S.Ct. at 2274-75. By contrast, in this case, the scheduling of shifts was not governed by any collective bargaining agreement, and the proposed accommodation would not have deprived any employee of any contractually-established seniority rights or privileges, or indeed of any contractually-established rights or privileges of any kind.[15]
 
 
 24
 More important, unlike in Hardison, there is no evidence that the proposed shift-scheduling arrangement would, in the end, have granted Opuku-Boateng a privilege or imposed more than a de minimis burden on other employees. In Hardison, not all TWA employees were required to work weekends. Those employees who had worked in a department the longest had first preference to take weekends off. Requiring another employee with greater seniority to substitute for Hardison on Saturday would have afforded Hardison the privilege of not working Saturday, and imposed the burden of working that day on the other employee, "according to religious beliefs." Hardison, 432 U.S. at 85, 97 S.Ct. at 2277.
 
 
 25
 In this case, by contrast, as the district court concluded, all employees at the Yermo station were required to work "an equal number of undesirable weekend, holiday, and night shifts." So long as Opuku-Boateng worked that equal number of "undesirable shifts," being assigned a holiday, Sunday, or night shift for every shift he missed to observe the Sabbath, he would not have been granted any preferential treatment, nor would any cognizable burden have been imposed on other employees who simply were assigned one undesirable shift instead of another. No evidence was offered that the shift assignments could not have been arranged in a manner that would have ensured that Opuku-Boateng and the other employees all received an equal number of undesirable shifts. Therefore, the State failed to carry its burden of demonstrating that Opuku-Boateng's practice of observing the Sabbath could not have been accommodated through scheduling arrangements without affording him preferential treatment.[16] Accordingly, we conclude that the district court clearly erred in determining that the proposed scheduling arrangement would have discriminated against Opuku-Boateng's fellow station employees. Compare Tooley, 648 F.2d at 1243 (concluding that exempting the plaintiffs from mandatory union dues and having them pay an equal amount to charity was reasonable because the plaintiffs would suffer the same economic loss as the union member employees) with Bhatia, 734 F.2d at 1384 (concluding that accommodation was unreasonable because the plaintiff's "coworkers would be required to assume his share of potentially hazardous work").
 
 
 26
 Opuku-Boateng also proposed an alternative means by which the State could accommodate his religious practices without affording him preferential treatment or discriminating against his coworkers. This alternative, voluntary shift trades, could have been implemented by itself or in combination with the proposed scheduling arrangement discussed above.[17] For example, the State could have prepared a six-month or year-long schedule in advance, determined how many Sabbath shifts Opuku-Boateng would ordinarily be assigned, and then determined how many of those shifts his coworkers would be willing to accept in exchange for undesirable Sunday, holiday, or night shifts that they would otherwise have had to work. It is not unreasonable to assume that other employees would have been willing to trade for many, if not all, of Opuku-Boateng's Sabbath shifts in exchange for shifts that they were assigned and might have found even more undesirable. By preparing a tentative schedule, the State might well have determined that voluntary shift trades would completely eliminate the hypothetical difficulty resulting from the need to accommodate Opuku-Boateng's religious beliefs.
 
 
 27
 The State conceded at oral argument that it had an obligation to investigate whether voluntary trading of shifts was feasible. Relying on the results of a flawed poll of the Yermo station employees, the district court concluded that voluntary shift trades were not feasible. We conclude that the district court erred in relying on those results, and that the State failed to offer any probative evidence that would demonstrate that a system of voluntary shift trades was infeasible.
 
 
 28
 Ingham's testimony regarding the results of the poll, if offered for its truth, constituted inadmissible hearsay, for he testified as to what the supervisor who conducted the poll told him the employees said when they were asked about the possibility of accommodating Opuku-Boateng's religious beliefs. See Fed.R.Evid. 801(c). Because no hearsay exception applies to the supervisor's statement that the Yermo station employees said that they were not willing to accommodate Opuku-Boateng through voluntary shift trades, the district court properly determined that it could not consider Ingham's testimony for the purpose of establishing the poll results.[18] Notwithstanding this determination, the court subsequently relied expressly on the poll results when determining whether voluntary shift trades were feasible. It stated, "the informal poll taken by defendants indicated that none of the employees were willing to accommodate [Opuku-Boateng] on a permanent basis, although a few were willing to trade shifts with [him] occasionally." To the extent that the district court relied on Ingham's hearsay testimony regarding the results of the poll, it was in error.[19]
 
 
 29
 The State contends that the district court relied not only on the results of the poll, as recounted by Ingham, but also on "independent" testimony that the Yermo station employees were not willing to accommodate Opuku-Boateng. We disagree. As a preliminary matter, we see no indication in the record that the district court relied on any "independent" testimony. More important, the testimony in the record does not support the conclusion that the Yermo station employees were unwilling to make a reasonable accommodation. The State draws our attention to Maria Lozano's testimony. Her testimony, however, substantially undermines the reliability of the poll itself. Lozano testified that when she was asked whether she would be willing to trade shifts with Opuku-Boateng, it was her belief that he would be unable to work three days per week, not just one twenty-four-hour period. Her belief was not simply a mistake on her part. Lozano stated that various supervisors had told her that accommodating Opuku-Boateng's request would involve three days per week.[20] Without any evidence to the contrary, we can only assume that the other employees were polled about a three-day accommodation as well.[21] Accordingly, we fail to see how the evidence suggests, let alone establishes, that the Yermo station employees were collectively unwilling to accommodate Opuku-Boateng by trading shifts with him in a manner that would enable him to observe the Sabbath.
 
 
 30
 In any event, the evidence conclusively demonstrates the inadequacy of the State's efforts. The State conducted a vague and ambiguous poll that was not capable of producing reliable results regarding the question whether an accommodation was practicable. The issue was not, as the question asked of Lozano, and presumably other employees, implied, whether any one employee would be willing to accommodate Opuku-Boateng's religious beliefs by trading for all of his Sabbath shifts. Instead, the issue was whether over the course of a year (or any other fixed period of time) there would be a sufficient number of employees in the station who would agree to work one or more of Opuku-Boateng's Sabbath shifts in exchange for his working one or more shifts assigned to them that they found equally undesirable. (district court stating employees were required, on an annual basis, to work an equal number of undesirable weekend, holiday, and night shifts); (Fred Sandridge stating that supervisors sought to equalize such shifts over "a 12-month period"). The State failed to conduct the type of inquiry into the feasibility of trading shifts that would have been necessary to answer that question one way or the other, and thus to enable it to carry its burden.[22]
 
 
 31
 Accordingly, we conclude that the district court clearly erred in concluding that an accommodation of Opuku-Boateng's religious beliefs would have been unreasonable, because the State failed to establish that (1) scheduling adjustments by the Department would have discriminated against the other Yermo station employees and (2) those employees would have been unwilling to make voluntary trade shifts that would have accommodated those beliefs. In this connection, we note finally that neither the district court nor the State examined the question how a combination of these two proposals might have worked, had it not been possible to accomplish the accommodation by implementing either one by itself.
 
 
 32
 Having addressed the district court's conclusions regarding the impact the proposed accommodations would have had on Opuku-Boateng's coworkers, we now consider its conclusions regarding their potential impact on the operation of the station. We conclude that the district court clearly erred in determining that an accommodation involving either a scheduling arrangement or voluntary trading of shifts or a combination of the two would have caused an undue hardship with respect to "the conduct of the employer's business" or any "disruption of its work routine." See Townley Eng'g, 859 F.2d at 615 (citations omitted).
 
 
 33
 The district court determined that even though Opuku-Boateng proposed to work additional Sunday, holiday, and night shifts in exchange for not working on his Sabbath, such an accommodation was nonetheless infeasible because it would have resulted in his working a more predictable schedule, in violation of departmental policy. Although the Department had a legitimate interest in varying the work schedules of its border station employees in order to discourage bribery or dishonesty, there is no probative evidence that suggests that accommodating Opuku-Boateng's religious beliefs would have resulted in a schedule that was so predictable (either for Opuku-Boateng or his co-workers) that it would have jeopardized the Department's security interests.[23]
 
 
 34
 The district court also concluded that the Department's ability to accommodate the scheduling needs of other employees would have been affected and that morale problems with a significant impact could have arisen. We find this conclusion clearly erroneous as well. First, the district court incorrectly based its conclusions on its finding that Opuku-Boateng would be accorded preferential treatment. As we have already explained, this finding was in error. Second, the evidence introduced by the State as to its ability (or lack thereof) to accommodate other employees' scheduling desires was wholly inadequate. Third, hypothetical morale problems are clearly insufficient to establish undue hardship. "Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship." Anderson v. General Dynamics Convair Aerospace Div., 589 F.2d 397, 402 (1978), cert. denied in International Ass'n of Machinists and Aerospace Workers AFL-CIO v. Anderson, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); Burns v. Southern Pac. Transp. Co., 589 F.2d 403, 407 (9th Cir.1978), cert. denied, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).[24] Likewise, the mere possibility that there would be an unfulfillable number of additional requests for similar accommodations by others cannot constitute undue hardship. See Burns, 589 F.2d at 407 (rejecting contention that "accommodating [the plaintiff] would open the gate to excusing vast numbers of persons who claimed to share [the plaintiff's] beliefs," where the record established that only three of the union's members were Seventh Day Adventists).[25] Far more concrete undue hardship is required before an employer can be said to have met its burden. See Townley Eng'g, 859 F.2d at 615 ("A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of 'actual imposition on co-workers or disruption of the work routine.' ") (citation omitted).
 
 
 35
 Thus, we conclude that the district court erred in determining that the proposed scheduling arrangement, voluntary trade shifts, or a combination of the two, would have resulted in undue hardship.
 
 Temporary Accommodation and Transfer
 
 36
 Finally, Opuku-Boateng proposed a temporary or trial accommodation that would have allowed the Department to experiment with the proposed accommodations and permitted both parties to investigate the possibility that Opuku-Boateng could be employed in another job in the Department or some other State agency, should the accommodations prove infeasible in practice. The district court rejected this suggestion also. We disagree. At the very least, the State should have either temporarily scheduled Opuku-Boateng not to work on the Sabbath or sought to obtain voluntary shift trades for him on a short- or long-term basis.[26] Then, certainly by the end of his probationary term, it would have been able to determine what actual hardships, if any, would result. Had the State followed this course, it would have placed itself on far firmer ground to argue that Opuku-Boateng could not reasonably be accommodated. See Burns, 589 F.2d at 406 ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.") (citation and internal quotation marks omitted). Moreover, both Opuku-Boateng and the State would have had the opportunity during that period to attempt to locate another suitable permanent position for him in the Department or elsewhere in State employment.
 
 CONCLUSION
 
 37
 We conclude that Opuku-Boateng established a prima facie case of religious discrimination and that the State failed to demonstrate that he could not be reasonably accommodated without undue hardship. The district court clearly erred in concluding that the State carried its burden of establishing that undue hardship would have resulted from the various accommodations that Opuku-Boateng proposed. The State failed to show that any of the proposed accommodations would have unduly burdened the Department's operations or resulted in discriminatory treatment of the other employees. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED to the district court for the award of appropriate relief.
 
 
 38
 REVERSED and REMANDED.
 
 
 39
 SAMUEL P. KING, Senior District Judge, dissenting:
 
 
 40
 I would affirm the district court for the reasons stated by the district judge.
 
 
 
 *
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 The Grain Inspector position did not require that Opuku-Boateng work on the Sabbath
 
 
 [2]
 Plant Inspectors examine vehicles for quarantined agricultural products. The announcement for the position specified that applicants must be willing to work holidays, Sundays, and odd hours. Opuku-Boateng has expressed a willingness to work these days and times
 
 
 [3]
 Testimony regarding the poll was vague and uncertain. Three witnesses testified regarding the poll: Ingham, Whitacre, and Maria Lozano, an employee at the Yermo station. Neither Ingham nor Whitacre could state whether the poll was taken prior to a final decision on Opuku-Boateng's appointment. Lozano, however, remembered being questioned before November 2, 1982, the date on which Opuku-Boateng was scheduled to begin work
 
 
 [4]
 Opuku-Boateng objected to Ingham's testimony regarding the poll on hearsay grounds, but the district court allowed Ingham to testify. The district court stated,
 I'm admitting the evidence that a poll was taken--the fact that a poll was taken itself can be hearsay, but it is received of course not for the truth of what was developed....
 I'm going to permit him to testify to what results were reported to him with the understanding that they are not being accepted ... as proof of the truth of the outcome of the poll....
 Ingham stated that he was told that none of the Yermo station employees was willing to accommodate Opuku-Boateng on a regular basis. Whitacre recalled the poll but said that he could not state what question was asked or how many employees were contacted. Lozano recalled that when asked whether she would be willing to accommodate Opuku-Boateng, she said that she was willing to trade shifts but not on a permanent basis. However, Lozano also recalled being told that the accommodation would involve three days per week, Friday, Saturday, and Sunday.
 
 
 [5]
 There is no evidence in the record that Opuku-Boateng ever asked for anything other than one consecutive 24-hour period off each week, namely, his Sabbath
 
 
 [6]
 The record does not reflect any other mention of a labor union or that any organization had a contract to represent the station employees. Accordingly, we treat this part of the request as simply asking the employer to make a schedule adjustment
 
 
 [7]
 Section 2000e-2(a) states in part that "[i]t shall be an unlawful employment practice for an employer ... to refuse to hire ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion...." 42 U.S.C. § 2000e-2(a)(1)
 
 
 [8]
 "The reasonable accommodation duty was incorporated into the statute, somewhat awkwardly, in the definition of religion." Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 n. 1, 107 S.Ct. 367, 369 n. 1, 93 L.Ed.2d 305 (1986)
 
 
 [9]
 In order to establish a prima facie case of religious discrimination, a plaintiff must meet a three-part test. EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 614 n. 5 (9th Cir.1988), cert. denied, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). The employee must establish that "(1) he had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer threatened him or subjected him to discriminatory treatment ... because of his inability to fulfill the job requirements." Heller, 8 F.3d at 1438. The employee need not be penalized with discharge to establish a prima facie case. Townley, 859 F.2d at 614 n. 5. ("The threat of discharge (or other adverse employment practices) is a sufficient penalty.")
 
 
 [10]
 The State specifically informed Opuku-Boateng that "since you are unable to meet [the requirement to be available to work frequently from Friday sundown through Saturday sundown] we are terminating the process to hire you."
 
 
 [11]
 The Supreme Court has made it clear that an accommodation that imposes more than a de minimis cost to the employer constitutes an undue hardship. See Ansonia, 479 U.S. at 66-68, 107 S.Ct. at 371 (stating that in Hardison, the Court held that "an accommodation causes 'undue hardship' whenever that accommodation results in 'more than a de minimis cost' to the employer."). As we have stated, "The statute ... posits a gain-seeking employer exclusively concerned with preserving and promoting its economic efficiency." Townley Eng'g, 859 F.2d at 616. Accordingly, additional costs in the form of lost efficiency or higher wages may constitute undue hardships. Hardison, 432 U.S. at 84, 97 S.Ct. at 2276-77
 
 
 [12]
 In some of our cases, relying on Hardison, we have said that an accommodation that imposes more than a de minimis impact on coworkers may also constitute an undue hardship. See Bhatia, 734 F.2d at 1384; Yott, 602 F.2d at 908; Burns, 589 F.2d at 406. However, Hardison, as well as Bhatia, the only case in which we have considered whether the impact on coworkers constituted an undue hardship, involved accommodations that would have resulted in a significant discriminatory impact on the plaintiff's coworkers. See Hardison, 432 U.S. at 80-81, 97 S.Ct. at 2274-75 (finding that accommodation would have deprived coworkers of seniority rights contained in collective bargaining agreement and have resulted in discriminatory treatment); Bhatia, 734 F.2d at 1384 (concluding that accommodation would have required coworkers to assume the plaintiff's share of potentially hazardous work); see also Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 487 (2d Cir.1985) (suggesting that "Hardison may be read as equating 'undue hardship' with preferential treatment."), aff'd on other grounds and remanded, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). Here, as we explain below, the alleged impact is not only de minimis and non-discriminatory but hypothetical
 
 
 [13]
 Ingham's testimony regarding the poll constituted double hearsay, or hearsay upon hearsay: he testified as to what the unknown supervisor who conducted the poll said the employees said when they were asked whether they would accommodate Opuku-Boateng. We address later in the opinion whether the results of the poll were properly admitted
 
 
 [14]
 The Second and Eighth Circuits have interpreted Hardison in a similar manner. In Brown v. General Motors Corporation, 601 F.2d 956, 961 (8th Cir.1979), the Eighth Circuit rejected the district court's conclusion that accommodating the plaintiff was impermissible because it "would in effect discriminate against all employees who did not adhere to [the plaintiff's] religion." Id. The court stated, "Such an application of Hardison would prove a per se proscription against any and all forms of differential treatment based on religion.... Carried to its logical conclusion the [district] court's application of the quoted language [from Hardison ] would preclude all forms of accommodation and defeat the very purpose behind § 2000e(j)." Id. at 961-62; see Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 487 (2d Cir.1985) ("Differential treatment cannot be equated with privileged treatment. Accepting the school board's argument would 'preclude all forms of accommodation and defeat the very purpose behind § 2000e(j).' ") (quoting Brown, 601 F.2d at 962), aff'd on other grounds and remanded, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)
 
 
 [15]
 In Hacienda Hotel, we stated that the Hardison Court "addressed the degree of accommodation that was required of an employer within the framework of a [collectively bargained] seniority system." 881 F.2d at 1513. That the Hardison Court was specifically concerned with the duty to accommodate in the context of a collectively bargained seniority system is made clear by the following passage:
 We are ... convinced ... that TWA cannot be faulted for having failed to work out a shift or job swap for Hardison. Both the union and TWA had agreed to the seniority system; the union was unwilling to entertain a variance over the objection of men senior to Hardison; and for TWA to have arranged unilaterally for a swap would have amounted to a breach of the collective-bargaining agreement.
 Hardison, 432 U.S. at 78-79, 97 S.Ct. at 2274. As the Court itself concluded, "we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement." Id. at 79, 97 S.Ct. at 2274.
 
 
 [16]
 Our analysis is equally applicable with respect to "covering" shift vacancies created by emergencies
 
 
 [17]
 We note that station employees were generally allowed to trade shifts
 
 
 [18]
 Polls generally raise complicated hearsay problems because they report what pollsters say the persons polled said. Here, the problem is even greater because Ingham did not conduct the poll. He was reporting what he had been told by the supervisor who conducted the poll. Accordingly, we are not concerned here with the question whether the testimony of the person who conducted the poll would have been admissible. We note, however, that a hearsay poll may be admitted as an exception to the hearsay rule if it is material and more probative on the issue than other evidence, and it has guarantees of trustworthiness. Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 522 (10th Cir.1987); Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir.1978). Here, as we explain more fully below, we seriously question the materiality and reliability of the poll conducted by the State, and find a total absence of guarantees of trustworthiness
 
 
 [19]
 Even aside from the fact that his testimony was inadmissible as hearsay, Ingham's testimony regarding the poll is not reliable. It reveals a confusion between the oral poll allegedly conducted prior to Opuku-Boateng's termination in 1982 and a subsequent poll conducted in 1983. In describing the 1982 poll, he stated that he wanted the Yermo station employees to be asked whether they "would be willing to trade on an on-going basis with fellow employees that wanted to attend college, employees that wanted a specific day off each week for religious purposes, and the third--I'm sure there was a third [example]...." Although Ingham stated that he was not confusing the two polls, his description of the 1982 poll not only differs from the recollection of Lozano, the only other witness who recalled the question asked in the poll, but it is also strikingly similar to the questions posed in the 1983 poll. The 1983 poll, which was taken the year after Opuku-Boateng was denied employment, asked Yermo station employees whether they would accommodate:
 
 
 [1]
 Scheduling employees time off so that they can attend school
 
 
 [2]
 Providing Sunday mornings off to those employees wanting to attend church
 
 
 [3]
 Providing those employees wishing time off sundown Friday evening until sundown Saturday evening each week to meet religious beliefs
 Pl. Exh. 6.
 
 
 [20]
 Although she was asked about a substantially more burdensome accommodation, Lozano testified that she responded that she would have been willing to trade shifts with Opuku-Boateng "sometimes but not all the time."
 
 
 [21]
 As the State concedes, Whitacre, who also testified regarding the poll, "could not recall specific details such as the specific nature of the question asked or the number of people contacted."
 
 
 [22]
 As we explained earlier, a proper investigation of the feasibility of an accommodation would, for example, have first determined the total number of Sabbath shifts Opuku-Boateng would be assigned over the forthcoming year as well as the projected schedules for that period of the other employees. Then, by asking the individuals polled how many specific shifts they would be willing to trade with Opuku-Boateng, the State could have determined whether the other employees of the station would collectively have been willing to make the necessary accommodation
 
 
 [23]
 The testimony of Fred Sandridge, a former manager of the Yermo station, suggests that the Department's policy is easily satisfied by a varied work schedule:
 [Opuku-Boateng's counsel:] So ... your policy basically is just not to have the people necessarily every day, every month, and every year working the same schedule?
 [Sandridge:] Right.
 [Counsel:] As long as there's some change back and forth so that truckers don't become too acquainted, that satisfies the policy?
 [Sandridge:] Yes.
 Likewise, Ingham stated that the policy was not to allow "fixed shifts where unethical arrangements could be made either with the traveling public or trucking industry." (Mimi Khan, an assistant director in the Department, stating "you don't want the same person there at the station on an ongoing basis....").
 
 
 [24]
 Indeed, as we noted in Anderson, "If relief under Title VII can be denied merely because the majority of employees, who have not been discriminated against, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." 589 F.2d at 402 (citation and internal quotation marks omitted)
 
 
 [25]
 The companion cases of Burns and Anderson, which post-date Hardison, considered the holdings in that case at length. For that reason alone, the dictum in a footnote in Hardison, cited by the State at oral argument, does not require a contrary result. In Hardison, the Supreme Court, replying to the dissent, mentioned in footnote 15 "the likelihood that a company as large as TWA may have many employees whose religious observances, like Hardison's, prohibit them from working on Saturdays or Sundays." Hardison, 432 U.S. at 84 n. 15, 97 S.Ct. at 2277 n. 15. Here, we are dealing with a very small number of employees
 Moreover, as the Eighth Circuit pointed out in Brown v. General Motors Corporation, 601 F.2d 956, 961 (8th Cir.1979),
 Our examination of the factual predicate upon which footnote 15 is based reveals that the trial court in Hardison found greater than de minimis cost associated with accommodating only Hardison. Thus, our reading of footnote 15 coincides with that expressed by Judge Winter's dissenting opinion in Jordan v. North Carolina National Bank, 565 F.2d 72, 78 (4th Cir.1977):
 [I]f it is to be presumed as a matter of law that an employer may be required to do for one employee only what it may do for all employees "without undue hardship," no employer would ever be required to accommodate any religious belief of any employee.
 We agree with the Eighth Circuit, as well as with our own holding in Burns. Thus, we give little weight to the comment in footnote 15 to which the State refers.
 
 
 [26]
 Lozano testified that she had used three techniques to accommodate requests for time off. She (1) attempted to schedule the employee to provide the requested day off, (2) provided the employee with shifts that would afford him sufficient time to attend to his personal business, or (3) scheduled the employee to work a desirable shift to enhance his ability to trade with other employees. The record indicates quite clearly that temporary accommodations were possible, at least for shifts that were scheduled at a particular time. Lozano, for example, testified that she had accommodated herself and two other inspectors to attend semester-long college courses. The record also shows that a Catholic minister who needed Sunday mornings off had been accommodated for a period of ten years