# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1694

_____

| | |
|---|---|
| Hosea Harrell, Jr., | * |
| | * |
| Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the Western District |
| | * of Missouri. |
| Patrick R. Donahue, | * |
| Postmaster General, | * |
| United States Postal Service,[1] | * |
| | * |
| Appellant. | * |

_____

Submitted: November 16, 2010
Filed: March 31, 2011

_____

Before WOLLMAN, HANSEN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Hosea Harrell is a member of the Seventh-day Adventist Church and a former employee of the United States Postal Service (USPS). After being fired from his position with the post office in Warrensburg, Missouri, Harrell brought suit against the Postmaster General, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., (Title VII) for religious discrimination and failure to accommodate as well as a violation of the Religious Freedom Restoration Act of

_____

[1] Patrick R. Donahue is substituted for his predecessor, John E. Potter, as Postmaster General, under Fed. R. App. P. 43(c)(2).

1993, 42 U.S.C. §§ 2000bb et seq., (RFRA). The district court[2] granted summary judgment in favor of the USPS, and we affirm.

I.

At all times relevant to this appeal, the Warrensburg Post Office was responsible for seven "bid routes" that required approximately eight hours to complete and one "auxiliary route" that took between five to eight hours to complete. To cover these routes Monday through Saturday, the Warrensburg Post Office employed seven full-time letter carriers, a full-time letter carrier technician, and three part-time flexible letter carriers.[3] A minimum of seven letter carriers was required each day to complete the routes. Each full-time letter carrier was assigned to one of the bid routes with the technician and part-time letter carriers filling in on the various bid routes and the auxiliary route as needed.

According to a seniority system used by the Warrensburg Post Office, the six most junior full-time letter carriers and the technician had rotating schedules, working five days a week with every Sunday off and another rotating day off. As a result, each letter carrier with a rotating schedule was scheduled to be off work approximately every sixth Saturday. The only full-time letter carrier without a rotating schedule was the most senior letter carrier, who worked Monday through Friday with weekends off.

Many other scheduling details at the Warrensburg Post Office were expressly controlled by a collective bargaining agreement (CBA) between the National Association of Letter Carriers—the union for city letter carriers working for the

---

[2] The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

[3] In November 2007, one of the Warrensburg Post Office's part-time flexible letter carriers was assigned as a temporary supervisor. After that assignment, the Warrensburg Post Office was left with only two part-time flexible letter carriers.

USPS—and the USPS. For example, the CBA controlled the process by which annual leave was granted. During "choice" vacation months,[4] annual leave was awarded under a bidding system whereas annual leave outside the "choice" vacation months was awarded on a first-come basis. The CBA also permitted an employee to request "leave without pay" but did not specify the process by which the USPS granted such requests. Rather, according to the USPS Employee and Labor Relations Manual, leave without pay was granted at the discretion of the USPS, considering the needs of the employee, the needs of the USPS, and the cost to the USPS.

Harrell began working for the USPS in 2001 as a part-time flexible letter carrier for the Warrensburg Post Office. In 2004, Harrell bid for and was awarded a full-time letter carrier position that operated on a rotating schedule. From the time of Harrell's hiring as a full-time letter carrier until his eventual firing, Harrell remained the most junior full-time letter carrier at the Warrensburg Post Office.

In November 2006, Harrell submitted a written request to James Carothers, Supervisor of Customer Services for the Warrensburg Post Office, requesting a religious accommodation to have every Saturday off because working at any time between sundown Friday to sundown Saturday conflicted with his religious beliefs as a Seventh-day Adventist. In January 2007, Harrell, Carothers, and a union representative met to discuss Harrell's request. During this meeting, Harrell rejected the proposition that he be given leave for part of the day on Saturdays to attend church services and insisted that the only acceptable accommodation was that he receive every Saturday off. In February 2007, Carothers and Rick Hudson, Postmaster for the Warrensburg Post Office, asked each full-time letter carrier whether they would be willing to give up any of their non-scheduled Saturdays to accommodate another letter carrier. Each declined.

---

[4] The choice vacation period was April 1 through October 31.

Shortly thereafter, Harrell submitted another written request for religious accommodation directly to Hudson. This request led to another meeting with Hudson, Carothers, and Harrell to discuss how the USPS could accommodate Harrell's request. At this meeting, Hudson and Carothers told Harrell he could attempt to swap scheduled days off with other letter carriers. Additionally, Harrell was asked whether he was willing to make a lateral transfer to another office or to a different position within the USPS. Shortly after this meeting, Harrell informed Hudson and Carothers that he would not accept the options they suggested. Harrell also reiterated his position that the only satisfactory accommodation was that he be given every Saturday off and that he preferred to not use annual leave or leave without pay to achieve this accommodation.

During the summer of 2007, Harrell began to request leave[5] for numerous Saturdays, but nearly all of his requests were denied. Ultimately, beginning on October 13, 2007, Harrell stopped working on Saturdays regardless of whether he was scheduled to work. Although Harrell requested leave for each absence, his requests were denied, and when he failed to report to work for his scheduled Saturday shifts, he was charged with being absent without leave. After Harrell was given three disciplinary suspensions due to his absences, he was terminated in March 2008.

On March 21, 2008, Harrell filed an Equal Employment Opportunity complaint with the USPS claiming he was discriminated against because of his religion when he received the three disciplinary suspensions. On July 24, 2008, the USPS issued a final decision denying Harrell's claims and concluding that "the evidence does not support a finding that the complainant was subject to discrimination as alleged." Harrell subsequently filed this action, claiming the USPS violated Title VII by discriminating against him because of his religion and by failing to accommodate his religious beliefs. Harrell also claimed the USPS violated RFRA by infringing on his ability to practice his religion without showing a compelling reason for doing so.

---

[5] The majority of Harrell's requests were for leave without pay.

II.

The district court granted the USPS's motion for summary judgment. First, the court granted summary judgment in favor of the USPS on Harrell's Title VII religious discrimination claim because, even assuming Harrell had proved a prima facie case for religious discrimination, the USPS had a legitimate, non-discriminatory reason for disciplining and ultimately firing Harrell when he failed to work his scheduled Saturday shifts. Second, the court also granted summary judgment in favor of the USPS on Harrell's failure to accommodate claim because the court concluded the USPS would suffer an undue hardship if it was required to accommodate Harrell's request. Third, the district court concluded Harrell could not bring an action under RFRA because Title VII is the exclusive remedy for a federal employee's claim of employment discrimination. Harrell appeals the district court's ruling only with respect to his Title VII failure to accommodate claim and his RFRA claim.

III.

We review de novo a district court's decision to grant summary judgment, viewing the record in the light most favorable to the nonmoving party. Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 605 (8th Cir. 2009) (quotation omitted). "We will affirm the grant of summary judgment if 'there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" Marksmeier v. Davie, 622 F.3d 896, 899 (8th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)).

A.

Title VII requires an employer to reasonably accommodate the religious beliefs of its employees unless the employer can demonstrate that doing so would impose an undue hardship. 42 U.S.C. § 2000e(j); Phillips v. Collings, 256 F.3d 843, 850 (8th Cir. 2001). It is undisputed that the USPS knew of Harrell's sincere religious belief

and that this belief conflicted with one of Harrell's employment requirements as a full-time letter carrier working on a rotating schedule. As a result, the USPS must show either that it offered Harrell a reasonable accommodation or that accommodating Harrell's request would have resulted in an undue hardship. See Brown v. Gen. Motors Corp. (Brown I), 601 F.2d 956, 959-60 (8th Cir. 1979); accord Peterson v. Hewlett-Packard Co., 358 F.3d 599, 606 (9th Cir. 2004). The district court did not address whether the USPS had offered Harrell a reasonable accommodation because it found that granting Harrell's request for religious accommodation would have created an undue hardship. We agree that accommodating Harrell's religious beliefs "could not be accomplished without undue hardship."[6] Brown v. Polk Cnty., Iowa (Brown II), 61 F.3d 650, 654 (8th Cir. 1995) (en banc) (quoting United States v. Bd. of Educ., 911 F.2d 882, 887 (3d Cir. 1990)).

Determinations of what constitutes an "undue hardship" must be made on a case-by-case basis. See Brown II, 61 F.3d at 655. Harrell's request for religious accommodation was that he be given every Saturday off, either through a change to his scheduled day off or through the use of annual leave and approved leave without pay. We evaluate each option in turn.

1.

The accommodation requested by Harrell that he be given every Saturday as a scheduled day off would have violated the CBA, and the USPS was therefore not

---

[6] On appeal, Harrell contends that the question before this Court is whether the USPS could have accommodated Harrell's nine absences on Saturdays between October 13 and December 29, 2007, the absences that led to his firing, without suffering an undue hardship. We disagree. The question is whether the USPS could have accommodated Harrell's requested religious accommodation—to be exempted from working on all Saturdays—without suffering an undue hardship. 42 U.S.C. § 2000e(j). That inquiry is not altered simply because Harrell was disciplined after missing nine particular Saturdays.

required under Title VII to grant Harrell's request. Section 1.A.3. of article 41 of the national CBA states that "[t]he existing local procedures for scheduling fixed or rotating non-work days and the existing local method of posting and of installation-wide or sectional bidding shall remain in effect unless changes are negotiated locally." When Harrell became a full-time letter carrier, he did so by bidding on a bid position that operated on a rotating schedule. These rotating schedules were established under the Warrensburg Post Office's seniority system, and it is not disputed that this system was in place at the Warrensburg Post Office when the current CBA took effect. The Local Memorandum of Understanding for the Warrensburg Post Office does not indicate any change to the seniority system's method of scheduling and neither party claims that a change to the system was negotiated locally. Therefore, the national CBA required that the existing procedure "for scheduling fixed or rotating non-work days . . . remain in effect."

By seeking every Saturday as a scheduled day off, Harrell effectively asked for the USPS to make a unilateral change to his bid position so that he would operate under a fixed schedule rather than a rotating one. However, the CBA prohibited the USPS from making this accommodation, and doing so would have therefore imposed an undue hardship. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 81 (1977); Mann v. Frank, 7 F.3d 1365, 1369 (8th Cir. 1993).

2.

As an alternative to a permanent change to his scheduled day off, Harrell contends the USPS could have accommodated him through annual leave and approved leave without pay. But this proposed accommodation would have also created an undue hardship.

In addition to the violation of a collective bargaining agreement, an accommodation creates an undue hardship if it causes more than a de minimis impact

on co-workers.  See Brown II, 61 F.3d at 655 (explaining that an undue hardship exists if there is an "actual imposition on co-workers" rather than mere "proof of some fellow-worker's grumbling" (quoting Burns v. S. Pac. Transp. Co., 589 F.2d 403, 407 (9th Cir. 1978))); see also EEOC  v. Firestone Fibers & Textiles Co., 515 F.3d 307, 317 (4th Cir. 2008) ("[A]n employer is not required to accommodate an employee's religious need if it would impose personally and directly on fellow employees.") (internal quotation omitted); Balint v. Carson City, Nev., 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) ("Undue hardship may also be present when an accommodation would cause more than a de minimis impact on coworkers, such as depriving coworkers of seniority rights.").  Certainly, every religious accommodation will inevitably cause some differences in treatment among employees, and differential treatment alone is not enough to create an undue hardship.  See Brown I, 601 F.2d at 961-62.  But if accommodating an employee's religious beliefs also causes a "real" and "actual" imposition on co-workers, Brown II, 61 F.3d at 655, Title VII does not require an employer to make such an accommodation.  Hardison, 432 U.S. at 81 ("It would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far."); Opuku-Boateng v. California, 95 F.3d 1461, 1469-70 (9th Cir. 1996) (explaining that Hardison bars "*preferential* treatment of employees" in accommodating religious practices under Title VII (quoting Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1243 (9th Cir. 1981))).

In this case, requiring the USPS to grant leave to Harrell for scheduled Saturday shifts—either through annual leave or leave without pay—would have substantially imposed on Harrell's co-workers.  Specifically, excusing Harrell from having to work on Saturdays would effectively violate the Warrensburg Post Office's long-standing

seniority system, depriving Harrell's co-workers of their rights under the seniority system.[7]

The Warrensburg Post Office required at least seven letter carriers each weekday and Saturday to cover its routes. Because it was impossible to give each full-time letter carrier every Saturday off, the Warrensburg Post Office utilized a seniority system to schedule work for full-time letter carriers. Under this system, the most senior full-time letter carrier had a fixed schedule with every Saturday and Sunday off while the other six full-time letter carriers and the full-time letter carrier technician had a rotating schedule with Sunday and one other rotating day off each week. Accordingly, the burden of Saturday work was spread out among those with a rotating schedule, including Harrell, such that each received approximately every sixth Saturday off. But relieving Harrell, the most junior full-time letter carrier, of his responsibility for Saturday work would have violated the seniority system and required the USPS to assign another letter carrier in Harrell's place. This accommodation would have burdened other letter carriers with more Saturday work at least in part because they did not share Harrell's religious beliefs. See Hardison, 432 U.S. at 81. Indeed, Harrell's counsel conceded at oral argument that accommodating Harrell's religious beliefs would have required other letter carriers to work Saturday shifts that they otherwise would have had off under the seniority system. These impositions are neither hypothetical nor speculative and would have constituted an undue hardship. See id. at 80-81; Firestone, 515 F.3d at 317-19.

---

[7] Despite Harrell's multiple prior statements that he must be given every Saturday off to accommodate his religious beliefs, Harrell's counsel at oral argument conceded that the USPS need not give Harrell a particular Saturday off if it would result in increased costs to the USPS or a decrease in efficiency. But even if granting leave to Harrell on Saturdays would not directly cause increased costs or decreased efficiency to the USPS, it would still create an undue hardship by violating the Warrensburg Post Office's seniority system and imposing on Harrell's co-workers.

The language of Title VII also confirms that the USPS was not required to violate the Warrensburg Post Office's seniority system to accommodate Harrell. Section 703(h) of Title VII states that "[n]otwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system." 42 U.S.C. § 2000e-2(h). This provision makes clear that "[e]mployers need not transgress upon their seniority systems to make accommodations" for an employee's religious beliefs. Balint, 180 F.3d at 1053. "Thus, absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory practices." Hardison, 432 U.S. at 82. Accordingly, the USPS was not required to violate the Warrensburg Post Office's seniority system to accommodate Harrell's religious beliefs.

Harrell argues, however, that violating the Warrensburg Post Office's seniority system would not create an undue hardship because the seniority system was not established under the CBA. If the seniority system was not created under the CBA, Harrell reasons, the rights of Harrell's co-workers under the seniority system are not contractually protected by the CBA and therefore depriving them of those rights would not create an undue hardship. For this argument, Harrell relies heavily on the Supreme Court's decision in Hardison, where the Court declared that Title VII did not require an employer to violate a seniority system created under a collective bargaining agreement to accommodate the religious beliefs of an employee. 432 U.S. at 79-83. The Court noted that "a seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." Id. at 78. Thus, violating a seniority system to accommodate one employee's religious beliefs would deny another employee his shift preference so that the employee with a religious objection could be given his. Id. at 80. But the Court concluded that "Title VII does not require an employer to go that far." Id. at 81.

-10-

Although <u>Hardison</u> involved a seniority system that was established under a collective bargaining agreement, its holding was not as limited as Harrell suggests. The Court in <u>Hardison</u> was concerned with the unequal treatment that would arise from violating a seniority system to accommodate the religious beliefs of one employee and unequivocally concluded that "Title VII does not contemplate such unequal treatment." <u>Id.</u> at 81. Such unequal treatment can arise irrespective of whether the seniority system was established under a collective bargaining agreement or whether it was unilaterally imposed by an employer. <u>See</u> <u>US Airways, Inc. v. Barnett</u>, 535 U.S. 391, 403-05 (2002) ("[T]he relevant seniority system advantages, and related difficulties that result from violations of seniority rules, are not limited to collectively bargained systems."); <u>Weber v. Roadway Exp., Inc.</u>, 199 F.3d 270, 273 (5th Cir. 2000) ("The fact that [an employee's] casual co-workers have no contract entitling them to a particular run or job preference does not exclude the instant case from <u>Hardison</u>'s coverage."). Moreover, as previously mentioned, section 703(h) of Title VII explains that employers need not violate seniority systems to accommodate an employee's religious beliefs. But nothing in the language of section 703(h) limits its application to only those "bona fide seniority or merit system[s]" that are created pursuant to a collective bargaining agreement. Therefore, the USPS was not required to violate the Warrensburg Post Office's seniority system to accommodate Harrell.

Accordingly, the district court properly dismissed Harrell's Title VII failure to accommodate claim.

B.

Harrell also claims the district court erred by granting summary judgment in favor of the USPS on his RFRA claim. Harrell admits that his RFRA claim relies on the same operative facts—that the USPS required him to work on Saturdays, which violated his religious beliefs—that form the basis for his Title VII claim. But Harrell

argues that because he properly exhausted his administrative remedies, as required by Title VII, he is also free to seek relief under RFRA. We disagree.

In 1976, the Supreme Court declared that "the Civil Rights Act of 1964, as amended, provides the exclusive remedy for claims of discrimination in federal employment." Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976). The Court's analysis hinged in large part on the "established principle" that "a precisely drawn, detailed statute pre-empts more general remedies." Id. at 834. Accordingly, we have previously rebuffed attempts by federal employees to seek remedies outside Title VII for claims of employment discrimination. See, e.g., Mathis v. Henderson, 243 F.3d 446, 449 (8th Cir. 2001); Gergick v. Austin, 997 F.2d 1237, 1239 (8th Cir. 1993) (refusing to allow a federal employee to "supplement . . . his retaliation claim under Title VII" with a claim for emotional distress under the Federal Tort Claims Act). Therefore, because Title VII was undoubtedly the exclusive remedy for claims of discrimination in federal employment prior to RFRA, we must determine whether RFRA created an additional remedy for federal employment discrimination that had not previously existed.[8]

RFRA, which Congress passed in 1993, provides that the Government cannot impose a law that substantially burdens a person's free exercise of religion unless the Government demonstrates that the law "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1)-(2). The statute "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after [the passage of RFRA]." 42 U.S.C. § 2000bb-3(a). Although this language does not precisely explain RFRA's interplay with Title VII, both the House Report and the Senate Report unequivocally state that

---

[8] The Third Circuit has previously weighed in on this issue, concluding that Title VII remains the "exclusive remedy for job-related claims of federal religious discrimination" after RFRA. Francis v. Mineta, 505 F.3d 266, 272 (3d Cir. 2007).

RFRA was not intended to affect religious accommodation under Title VII. S. Rep. No. 103-111, at 13 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1903 ("Nothing in this act shall be construed as affecting religious accommodation under Title VII of the Civil Rights Act of 1964."); H.R. Rep. No. 103-88, at 7 (1993) ("Nothing in this bill shall be construed as affecting Title VII of the Civil Rights Act of 1964.").

This conclusion is further supported by the history and purpose of RFRA. In 1990, the Supreme Court decided Employment Division v. Smith, 494 U.S. 872 (1990), the case that prompted Congress' passage of RFRA. Prior to Smith, the Court had traditionally held that any law that substantially burdened the free exercise of religion was constitutionally permissible only if the Government could show a compelling interest. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 214-15 (1972); Sherbert v. Verner, 374 U.S. 398, 406 (1963). In Smith, however, the Court concluded that generally applicable laws may survive constitutional scrutiny, even if those laws substantially burden the free exercise of religion, without the Government having to show a compelling interest. 494 U.S. at 884-85. Congress promptly responded to Smith by passing RFRA. See S. Rep. No. 103-111, at 2, 8-9 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1893, 1897-98 (explaining the purpose of RFRA); H.R. Rep. No. 103-88, at 1-5 (1993) (same). Thus, the purpose of RFRA was to return to what Congress believed was the pre-Smith status quo of requiring the Government to show a compelling interest for any law that substantially burdened the free exercise of religion. Francis v. Mineta, 505 F.3d 266, 270 (3d Cir. 2007); In re Young, 141 F.3d 854, 857 (8th Cir. 1998). RFRA was not intended to broaden the remedies for federal employment discrimination beyond those that already existed under Title VII. As a result, Harrell's claims under RFRA are barred because Title VII provides the exclusive remedy for his claims of religious discrimination.

IV.

The judgment of the district court is affirmed.

_____

-13-