**Gerard C. O'BRIEN, Plaintiff,**

**v.**

**CITY OF SPRINGFIELD, Springfield Education Association, Massachusetts Teachers Association, and National Education Association, Defendants.**

No. CIV.A. 02–30041–FHF.

United States District Court,
D. Massachusetts.

Aug. 12, 2003.

Gregory A. Hession, Springfield, MA, for Plaintiff.

Edward M. Pikula, Law Department, City of Springfield, Peter P. Fenton, Fenton & Fenton, Peter M. Murphy, City of Springfield, Associate City Solicitor, Springfield, MA, Amy Laura Davidson, Sandulli Grace, PC, Boston, MA, for Defendants.

### *MEMORANDUM AND ORDER*

FREEDMAN, Senior District Judge.

## I. INTRODUCTION

The plaintiff, Gerard C. O'Brien, a teacher in the Springfield public schools, brings suit for religious employment discrimination under 42 U.S.C. § 2000e–2(a)(1) against the City of Springfield and three affiliated teachers unions, the local Springfield Education Association (the "SEA"), the state level Massachusetts Teachers Association (the "MTA"), and the national level National Education Association (the "NEA").[1] The defendants now move for summary judgment on numerous grounds.[2] *See* Defs.' Mot. for Summ. J. (Doc. No. 16); Defs.' Mem. In Supp. of Mot. for Summ. J.(Doc. No. 17) ("Mem. In Supp."). The plaintiff opposes the defendants' motion for summary judgment. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Doc. No. 23) ("Opp'n").

## II. BACKGROUND

### A. *The Agency Service Fee*

O'Brien teaches physical education in the Springfield public schools. While public school teachers cannot be compelled to join a teacher's union, Massachusetts law provides that a teacher's union may charge non-union teachers what is referred to as either an "agency service fee" or a "fair share fee" ("fee"). *See* Mass. Gen. Laws ch. 150E, § 12. This fee ensures that every teacher covers their proportional share of the costs of collective bargaining and contract administration. Excluded from the agency service fee, however, are non-chargeable expenses, such as political expenditures, *see* Mass. Gen. Laws ch. 150E, § 12(1)-(2), and "contributions to charitable, religious or ideological causes not germane to [the union's] duties as the exclusive bargaining agent," *see id.* at § 12(4).

Teachers may challenge the validity or amount of an agency service fee by filing charges with the Massachusetts Labor Relations Commission ("MLRC"), *see* MASS. REGS. CODE tit. 456, § 17.06(1), and by simultaneously placing the disputed portion of the fee into an escrow account, *see id.* at § 17.07(1)-(2). Teachers bringing charges cannot be sanctioned for nonpayment of the fee while those charges are pending. *See id.* at § 17.16(2).

---

1. The Court will at times refer to the three teachers unions collectively as the "unions" and will at other times refer to the four defendants collectively as the "defendants."

2. The SEA, the MTA, and the NEA filed this motion for summary judgment (Doc. No. 16), which the City of Springfield opted to join, *see* Mot. to Join Union's Motion for Summ. J. (Doc. No. 31).

### B. O'Brien's Request for Religious Accommodation

For more than fifteen years O'Brien has maintained that—and the specific articulation proves to be important in this case—his Roman Catholic beliefs have prevented him from financially supporting any organization that advocates abortion or promotes condom distribution to children in public schools.[3] *See* Opp'n (Doc. No. 23), O'Brien Aff., ¶ 1 ("O'Brien Aff."). It was in April of 1987 that O'Brien first became aware that the SEA was officially affiliated with the MTA and the NEA, both of which directly promote condom distribution and pro-choice policies that conflict with O'Brien's Roman Catholic beliefs.[4] *See id.* at ¶ 2. As a result, each year that the SEA has assessed a fair share fee, O'Brien has formally requested that he be allowed to make a "charitable substitution" in lieu of paying the fair share fee to the SEA. *See, e.g., id.* at ¶ 5. Each time, the SEA has refused to accommodate O'Brien's request, and with each denial, O'Brien has paid his fee into an escrow account rather than directly to the SEA. *See id.*

### C. The SEA's Denials and Offers of Accommodation

O'Brien first appeared before the SEA Executive Committee to request a religious accommodation, along with fellow teacher and Roman Catholic, Edward Lundrigan, in September 1987. *See id.* at ¶ 3. The SEA voted unanimously to refuse their request. *See* Collins Aff. (Doc. No. 19), Exh. A (Letter from SEA President Meline Kasparian to O'Brien of 9/22/87). O'Brien maintains that the SEA also untruthfully denied that it was providing a religious accommodation to anyone else. *See* O'Brien Aff. at ¶ 4. After many years of requesting an accommodation and being denied, O'Brien eventually filed charges with the MLRC and joined *In the Matter of Springfield Educ. Ass'n, Massachusetts Teachers Ass'n, Nat'l Educ. Ass'n et al. and Belhumeur, et al.,* No. ASF–2143, a case tried before that agency. Although O'Brien hoped to address his religious objections to paying the fee to the SEA, *see* O'Brien Aff. at ¶ 5, the case was eventually appealed to the Massachusetts Supreme Judicial Court ("SJC") and decided on other grounds, *see Belhumeur v. Labor Relations Comm'n,* 432 Mass. 458, 735 N.E.2d 860 (2000), *cert, denied* 532 U.S. 904, 121 S.Ct. 1227, 149 L.Ed.2d 137 (2001) (finding some of the contested expenses to be nonchargeable) ("*Belhumeur II*").

In December 1994, SEA Treasurer Al Fabbre revealed to O'Brien that Frank Savoy, a Springfield school counselor, was

---

3. Naturally, O'Brien objects to financially supporting any of these causes directly.

 At this time, the defendants neither contest that O'Brien's beliefs are bona fide religious beliefs nor do they challenge the sincerity of O'Brien's beliefs.

4. While the SEA declares that it does not itself directly engage in the promotion of these policies, O'Brien maintains that during proceedings before the Massachusetts Commission Against Discrimination he learned that the single largest expenditure in the SEA's budget was for convention-related costs, which was, in turn, mostly comprised of the costs of sending delegates to the MTA and the NEA conventions where delegates would vote on and promote, among other things, various pro-abortion policies. *See* O'Brien Aff. at ¶ 12. O'Brien has repeatedly maintained that the SEA president voted to support condom distribution for students in grades 7–12 in response to the AIDS epidemic at a statewide MTA convention in July, 1987. *See* Collins Aff. (Doc. No. 19), Exhs. D (Letter from O'Brien to SEA President Linda C. Wilson of 1/19/95) and F (Letter from O'Brien to Springfield School Department Attorney Brian J. McCook of 3/8/95).

allowed to pay his fees directly to charity since October 1985 because of his religious objection. *See* O'Brien Aff. at ¶ 6. Letters written by various SEA treasurers to Mr. Savoy reveal that the SEA instructed him to forward payment for the "full equivalent of dues" to the SEA made out to an acceptable charity.[5] *See* Opp'n (Doc. No. 23), Exh. A (Letters from SEA Treasurer to Frank Savoy of 11/19/85, 12/23/87, 11/2/88, 10/17/89, 7/11/90, 2/6/91, 12/2/92, 11/2/93, 11/4/94, 11/7/95, 12/19/96, 10/17/97, 11/18/98, and 10/18/99) ("Savoy Letters"). The SEA granted this accommodation to Mr. Savoy because of his objections as a Seventh Day Adventist. *See id.* "[T]he religious foundation of the Seventh Day Adventist faith's opposition to union membership has long been [judicially] recognized." *See Equal Employment Opportunity Comm'n v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto,* 279 F.3d 49, 56 (1st Cir.2002) (citing cases).

Within a month of learning that the SEA was granting someone a religious accommodation, O'Brien met with SEA President Linda C. Wilson, hoping to obtain a religious accommodation similar to that granted to Mr. Savoy. *See* O'Brien Aff. at ¶ 8. Wilson denied O'Brien's request, flatly refusing even to discuss Mr. Savoy's situation. *See id.* A month later, in January of 1995, the SEA threatened to suspend O'Brien and six other teachers for five days without pay if they continued to refuse to pay agency service fees for the 1993–94 school year. *See* Collins. Aff. (Doc. No. 19), Exhs. C (from SEA President Linda C. Wilson to O'Brien of 1/17/95) (urging O'Brien to pay agency service fee or face five day suspension without pay) and E (Letter from SEA President Linda C. Wilson to Superintendent Peter Negroni of 1/26/95) (requesting superintendent to suspend for five days without pay six teachers for their failure to either join union or pay agency service fee). O'Brien sent yet another request to Brian J. McCook, the attorney for the Springfield School Department, for an accommodation similar to that granted to Mr. Savoy. *See* Collins. Aff. (Doc. No. 19), Exh. F (Letter from O'Brien to Springfield School Department Attorney Brian J. McCook of 3/8/95). The SEA responded with the first of three offers of accommodation, *see* Collins. Aff. (Doc. No. 19), Exh. G (Letter from SEA President Linda C. Wilson to O'Brien of 5/12/95) (first proposed accommodation), and postponed O'Brien's imminent suspension, *see* Opp'n (Doc. No. 23), Exh. B (Letter from Springfield School Department Attorney Brian J. McCook to O'Brien of 3/16/95) (informing O'Brien that his suspension was "put on hold"); O'Brien Aff. at ¶ 10. Because the parties contest the reasonableness of each of these three offers, the Court will elaborate on them.

---

**5.** The propriety of requiring Savoy to donate the full dues amount (as opposed to the agency service fee amount) to charity, *compare* Collins Aff. (Doc. No. 19), at 3 (listing amount of agency service fee for years 1987 to 2001) *with* Opp'n (Doc. No. 23), Exh. A (Letters from SEA Treasurer to Frank Savoy of 11/19/85, 12/23/87, 11/2/88, 10/17/89, 7/11/90, 2/6/91, 12/2/92, 11/2/93, 11/4/94, 11/7/95, 12/19/96, 10/17/97, 11/18/98, and 10/18/99) (demanding Savoy to pay amounts in excess of the agency service fees assessed during the corresponding years), is questionable considering that teachers who refuse to join the union may only be charged the agency service fee amount in the first place. *See* Mass. Regs. Code tit. 456, § 17.05. Moreover, the letters to Mr. Savoy cite "402 CMR 17:00" as granting the SEA authorization to collect the full dues level amount, *see* Savoy Letters, when the appropriate citation has been actually numbered "Title 456" since at least 1986, *see Belhumeur v. Labor Relations Comm'n,* 32 Mass.App.Ct. 939, 589 N.E.2d 352, 354 (1992) (citing the 1986 version of Title 456 of the Code Mass. Regs.).

### 1. *The First Proposed Accommodation*

The SEA's first offer would have allowed O'Brien to pay an amount equivalent to full union dues to the local SEA only. *See* Collins. Aff. (Doc. No. 19), Exh. G (Letter from SEA President Linda C. Wilson to O'Brien of 5/12/95). The SEA promised not to allocate any of O'Brien's funds to the MTA or the NEA as it normally would. *See id.* The letter justified this proposed accommodation by stating that the SEA took no position regarding abortion or condom distribution and that this was the same accommodation adopted in *Equal Employment Opportunity Comm'n v. Univ. of Detroit*, 904 F.2d 331 (6th Cir.1990). *See id.* O'Brien states further that at the time the SEA made the offer, it denied that a large portion of its budget went to the MTA and the NEA when, as O'Brien alleges, such a representation was untrue. *See* O'Brien Aff. at ¶ 12.

O'Brien declined this first offer because the SEA was affiliated with and contributed money to the MTA and NEA, both of which are pro-abortion and expend money they receive from the SEA to further their ideological causes. *See id.* at ¶ 13. O'Brien believed this offer would induce him to support the causes to which he religiously opposed, and requested that he be allowed to pay his agency fee directly to charity as he believed Mr. Savoy was allowed to do. *See id.*

On June 15, 1995, after O'Brien refused to accept the accommodation, the SEA reinstated its request to suspend him for five days without pay. *See* Collins. Aff. (Doc. No. 19), Exh. H (Letter from SEA President Linda C. Wilson to Superintendent Peter Negroni of 6/15/95).

### 2. *O'Brien's Suspension*

In October 1995, after proceedings before the Massachusetts Commission Against Discrimination ("MCAD"), the SEA decided to allow Mr. Lundrigan to release all of the money that he paid into escrow as service agency fees pursuant to *Belhumeur II* directly to a charity. *See* Opp'n (Doc. No. 23), Exh. C (Letter from Mr. Lundrigan's Attorney, John C. Scully, to MTA Attorney Eileen Cenci of 10/4/95). O'Brien took this as a sign that the SEA would offer the same accommodation to him. *See* O'Brien Aff. at ¶ 16. Instead, O'Brien was suspended without pay for one week beginning on November 13, 1995 for his failure to pay the 1993–94 agency service fee. *See id.* at ¶ 17.

On December 6, 1995, O'Brien filed an MCAD Complaint. O'Brien maintains that at his initial MCAD hearing, MTA Attorney Eileen Cenci and SEA President Linda C. Wilson lied to the MCAD by misrepresenting that no Catholics were being given a religious accommodation when both knew that the unions allowed Mr. Lundrigan to do so in October of that year. *See id.* at ¶ 18.

### 3. *The Second Proposed Accommodation*

In July 1997, the SEA made a second offer of accommodation. *See* Collins Aff. (Doc. No 19), Exh. I (Settlement Agreement and Release). The offer allowed O'Brien to contribute his future fees (in an amount equivalent to the full union dues) to the SEA which would then turn around and contribute the funds to a non-religious charitable organization. *See id.* The proposed agreement also required the SEA to compensate O'Brien for the week during which he was suspended without pay and for the attorney's fees he incurred. *See id.*

O'Brien complained that the offer allowed the SEA to keep all past agency service fees for the years 1987–88 to the

present, including the time period during which his complaint before the MLRC was pending. *See* O'Brien Aff. at ¶ 19. The SEA refused to admit any wrongdoing under the agreement, *see* Collins Aff. (Doc. No 19), Exh. I, despite what O'Brien perceived to be two blatant misrepresentations made to him before the MCAD, *see* O'Brien Aff. at ¶¶ 12 and 18. The agreement also contained a confidentiality clause prohibiting disclosure of the terms of the settlement, *see* Collins Aff. (Doc. No 19), Exh. I.

O'Brien rejected the offer because he believed that it did not fully resolve his objections since the SEA would keep all of the money paid into escrow. *See* O'Brien Aff. at ¶ 19. O'Brien also believed the confidentiality clause was unreasonable in light of the case's media publicity. *See id.* at ¶ 20.

At a subsequent hearing in October 1999, O'Brien observed SEA President Timothy Collins "seeth[ ] and literally turn[ ] red with anger as he addressed [O'Brien], mocking [O'Brien's] beliefs, and criticizing [O'Brien] for holding to his position of opposing paying dues to the SEA." *Id.* at ¶ 21.

### 4. *The Third Proposed Accommodation*

The SEA presented O'Brien with a third and final offer of accommodation on December 20, 1999. *See* Collins Aff. (Doc. No 19), Exh. J (Offer of Reasonable Accommodation). O'Brien also rejected this offer as unreasonable, pointing out that it required his future contributions to equal the "dues" level rather than the more appropriate agency service fee level and that it required his improperly withheld pay and attorney's fees to be paid out of the escrow fees, which he considered earmarked for charity, rather than paid by the SEA directly. *See id.;* O'Brien Aff. at ¶ 22. The

terms of this offer particularly offended O'Brien given what he perceived to be the SEA's "lies, delay[,] and bad faith during the last 15 years in which [he] tried to obtain this accommodation, which ... was [offered] to others." O'Brien Aff. at ¶ 22.

### 5. *O'Brien's Requested Accommodation*

It appears that O'Brien has sought the same religious accommodation throughout this fifteen year ordeal. First, O'Brien desires to have all agency service fees for the 1987–88, 1988–89, 1989–90, 1990–91, and 1992–93 school years currently held in escrow pursuant to *Belhumeur II* to be paid directly to a mutually agreed upon charity, exactly as O'Brien perceives that Mr. Lundrigan was allowed to do. *See* O'Brien Aff. at ¶ 23. Second, O'Brien desires to have all agency service fees for the school years 1993–94 to the present currently held in escrow to be remitted to charity. *See id.* Third, O'Brien wishes to pay his current and future agency service fees to charity, as O'Brien perceives that Mr. Savoy is allowed to do. *See id.* Fourth, O'Brien requests reimbursement (with interest) for the week during which he was suspended without pay. *See id.* Fifth, O'Brien requests that the SEA reimburse his attorney's fees in full on account of the SEA's bad faith in suspending him while granting another Roman Catholic, Mr. Lundrigan, the very accommodation that O'Brien sought. *See id.*

### III. STANDARD OF REVIEW

The Court will examine the summary judgment record "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party," the plaintiff in this case. *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000). Summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving [parties, the defendants in this case, are] entitled to a judgment as a *matter of law*." Fed.R.Civ.P. 56(c). "Even in employment discrimination cases 'where elusive concepts such as motive or intent are at issue,' this standard compels summary judgment if the non-moving party 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Id.* (*quoting Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

## IV. DISCUSSION

### A. *Grounds for Summary Judgment*

The defendants move for summary judgment on numerous grounds. The defendants argue that (1) the plaintiff's claims are time barred, (2) an agency service fee is, by its very terms, a reasonable accommodation, (3) accommodating the plaintiff would impose undue hardship upon the SEA and other employees, (4) the plaintiff has repeatedly rejected reasonable accommodations, and (5) the plaintiff's interpretation of Title VII violates the Establishment Clause of the First Amendment.[6]

### B. *Timeliness of the Plaintiff's Claims*

The defendants argue that O'Brien's claims are untimely, and both parties present to the Court polarized interpretations of *Nat'l R.R. Passenger Corp. v. Morgan,*

536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

### 1. *The Parties' Contentions*

The defendants argue that the clock started running on O'Brien's claims the moment that the SEA first denied his request for an accommodation on September 22, 1987. The defendants choose this date for two reasons. First, they argue that the specific employment practice that O'Brien now challenges is the SEA's refusal to grant him his requested religious accommodation. O'Brien undoubtedly knew that the collective bargaining agreement between the SEA and the School Committee required him to pay an annual agency service fee as a condition of employment in 1987; O'Brien also knew that the SEA had refused to accommodate him in 1987. Thus, the defendants argue, their first refusal to accommodate O'Brien triggered the limitations period. Moreover, the defendants maintain that simply requesting the same accommodation each subsequent year cannot restart the clock. *See De Leon Otero v. Rubero,* 820 F.2d 18 (1st Cir.1987) (statute of limitations period did not restart where subsequent, allegedly discriminatory actions were merely the continuing consequences of original demotion and were not independently actionable). The defendants reject the notion that each refusal to grant O'Brien's requested accommodation constituted a discrete act which triggered its own limitations period.

---

**6.** The defendant City of Springfield presents no other arguments other than those presented by the Unions. Thus, its motion intimately depends upon whether the unions reasonably accommodated O'Brien or could not do so absent undue hardship, since the superintendent suspended O'Brien for his failure to pay an agency service fee. If the Court finds that the unions failed their duty, then the City of

Springfield cannot justify its actions under the collective bargaining agreement. *See Nottelson v. Smith Steel Workers D.A.L.U. 19806,* 643 F.2d 445, 452 (7th Cir.1981) ("It is well settled ... that Title VII rights cannot be bargained away and that a collective bargaining agreement therefore does not of itself provide a defense for Title VII violations").

Second, the defendants argue that O'Brien's suspension on November 13, 1995 was not independently actionable, but rather the "delayed, but inevitable consequence" of the SEA's first denial of his request. *See Delaware State Coll. v. Ricks,* 449 U.S. 250, 257–58, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Therefore, because O'Brien knew that the SEA was not going to accommodate him and because he foresaw the consequences of refusing to pay the agency service fee, his claim accrued not on the date of his suspension but on September 22, 1987, the date on which the SEA first denied his request for accommodation.[7] The defendants bolster their position by noting that "O'Brien manifestly knew all he needed to know to construct a claim of discrimination, because he filed [a claim of discrimination] at the MCAD in 1988." Defs.' Mem. In Supp. (Doc. No. 17), at 11–12.

The plaintiff, on the other hand, argues that each incident in which he requested and was refused an accommodation constituted a discrete, independently actionable unlawful employment practice. O'Brien then argues that the ongoing negotiations between the parties and the filing of his MLRC complaint tolled the statute of limitations.[8] Lastly, O'Brien asserts that he possessed no duty to pay the fair share fee until the SJC resolved the *Belhumeur II* litigation in 2002.

### 2. *When the Plaintiff's Claims Accrued*

Two circuit courts of appeal have recently dealt with similar issues of claim accru-

al, and the analysis appears relatively straightforward in this instance.

In *Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130 (2003), the Second Circuit held that the rejection of an employee's proposed accommodation constituted a discrete act which triggered the Title VII statute of limitations, even though the employee continued to feel the effects of the rejection throughout the duration of his employment. *See* 318 F.3d at 134–35. The Second Circuit reasoned that "[t]he rejection of a proposed accommodation is a single completed action when taken, quite unlike the 'series of separate acts' that constitute a hostile work environment and 'collectively constitute' an unlawful employment practice." *Id.* at 134 (*quoting Morgan,* 536 U.S. at 117, 122 S.Ct. 2061). The Ninth Circuit explicitly adopted the Second Circuit's reasoning and further explained that an employee's claim accrued at the moment the employer denied the employee's proposed accommodation even where the employer denied the proposal pursuant to an ongoing, allegedly discriminatory policy. *See Cherosky v. Henderson,* 330 F.3d 1243, 1247 (9th Cir. 2003). The court reasoned that the employee's claims stemmed not from the policy itself but from the employer's individualized decisions under that policy. *See id.*

In *Elmenayer,* the Second Circuit did not consider the situation where the employee repeatedly renewed his request for an accommodation, *see Elmenayer,* 318 F.3d at 135, the precise situation at issue in the present litigation. While the defendants insinuate that a plaintiff can easily

---

7. The defendants argue that viewing the suspension as the event which triggers the statute of limitations for O'Brien's claims would inequitably disadvantage them, since agency fee objectors can forestall their suspensions simply by filing a charge with the MLRC. *See* Mass. Regs. Code tit. 456, § 17.16 (union cannot invoke contractual sanctions against fee

objector who has charges pending before MLRC).

8. O'Brien's other position—that the SEA has been on notice of his objections since 1987, thereby fulfilling the purpose of the statute of limitations—is utterly untenable, and the Court will address it no further.

circumvent the statute of limitations simply by requesting an accommodation again and again, conceptualizing each time that the SEA considered O'Brien's nearly annual request for accommodation as an individual decision puts those fears to rest.

In Massachusetts, challengers of agency service fees have an unqualified right to object to the validity or amount of the fee each and every time the fee is assessed.[9] *See* MASS. REGS. CODE tit. 456, § 17.06, *implementing* Mass. Gen. Laws ch. 150E, § 12. This framework ensures that those who choose not to join the union and instead opt to pay the agency service fee are not forced to support political or ideological causes that are not germane to the union's duties as the collective bargaining representative. *See Belhumeur II,* 735 N.E.2d at 864–65 (outlining agency service fee principles). While O'Brien cannot challenge the imposition of one year's agency service fee repeatedly *ad infinitum,* he certainly is entitled to object each time the agency service fee is assessed, since each assessment is a distinct act independent of previous assessments. The Court therefore concludes that each denial of O'Brien's request for religious accommodation constitutes a discrete, allegedly discriminatory act that "starts a new clock for filing charges alleging that act." *Morgan,* 536 U.S. at 113, 122 S.Ct. 2061.

### 3. *Timeliness of Claims*

■ O'Brien filed his MCAD complaint on December 6, 1995. Counting backwards 300 days, any claims accruing prior to February 9, 1995 are untimely. Consequently, the claims arising from the SEA's refusal to accommodate O'Brien for the

fees assessed for the 1987–88, 1988–89, 1989–90, 1990–91, and 1992–93 school years are untimely, and the Court will enter summary judgment in favor of the defendants on those claims.[10] The Court may, however, consider the facts surrounding the prior refusals as relevant background evidence in relation to O'Brien's timely claims. *See Morgan,* 536 U.S. at 113, 122 S.Ct. 2061.

O'Brien's filing of an MLRC complaint cannot save these discrimination claims. The only discrimination complaints that the MLRC handles involve employers and organizations that discriminate on the basis of whether or not an employee is a union member. *Compare* Mass. Gen. Laws ch. 23, § 9O (MLRC enabling statute) *and* Mass. Gen. Laws chs. 150A and 150E (labor relations laws which the MLRC enforces) *with* Mass. Gen. Laws ch. 6, § 56 (MCAD enabling statute) *and* Mass. Gen. Laws chs. 151B (employment, housing, credit, and mortgage lending discrimination laws which the MCAD enforces), 272 (public accommodations civil rights law which the MCAD enforces), 151B, § 3A (sexual harassment law which the MCAD enforces), 149, § 105D (maternity leave law which the MCAD enforces), 151C (civil rights and education laws which the MCAD enforces), 111, § 199 (lead paint laws which the MCAD enforces). It is the MCAD, not the MLRC, that is "a State or local agency with authority to grant or seek relief" from employment practices that discriminate on the basis of religion. 42 U.S.C. § 2000e–5(e)(1). Thus, only a complaint filed with that agency can toll the statutes of limitations for O'Brien's Title VII religious discrimination claims. *See id.*

---

9. While the challenger must have legitimate grounds for objection, *see* MASS. REGS. CODE tit. 456, § 17.06(3)(f)-(g), past challenges in no way preclude future challenges, *see generally* MASS. REGS. CODE tit. 456, §§ 17.00–17.16.

10. The SEA did not demand an agency service fee for the 1991–92 school year. *See* Collins Aff. (Doc. No. 19), at ¶ 10.

Another proposition put forth by O'Brien—that he possessed no duty to pay the fair share fee until the SJC resolved the *Belhumeur II* case, thus rendering his claims regarding the fee disputes timely— is equally dubious. The plaintiff's assertion is contradicted by the very provision he cites. MLRC regulations provide that an employee who decides to file a charge contesting the amount of the agency service fee must deposit an amount equal to the disputed portion of the fee into an escrow account. *See* Mass. Regs. Code tit. 456, § 17.07(1)-(2). The duty to pay the disputed amounts into escrow continues until the MLRC issues a final order. *See id.* at § 17.07(5). Failure to comply with this duty generally results in a dismissal of the charges. *See id.* at § 17.07(3). Thus, while the SJC ultimately determined that certain expenses included in the agency service fee were not actually chargeable, *see Belhumeur II*, 735 N.E.2d at 869, O'Brien's duty to pay some portion of the fair share fee remained throughout, *see* Mass. Regs. Code tit. 456, § 17.07; only the specific disputed amount was at issue. That O'Brien mistakenly believed that the *Belhumeur II* litigation would address his religious objections is to no avail. To press claims of religious discrimination, he had to file charges with that state entity capable of offering him relief, namely, the MCAD.

"The existence of [these] past acts and [O'Brien's] prior knowledge of their occurrence, however," does not prevent him from pursuing claims related to subsequent acts so long as the subsequent acts upon which the claims are based are independently discriminatory and the claims addressing those acts are timely filed. *Id.* (emphasis added). Consequently, the claims arising out of the SEA's refusal to accommodate O'Brien with respect to the fees assessed for the 1993–94 school year and all school years thereafter are timely.

The parties entered into good faith negotiations regarding accommodating O'Brien with respect to the fees assessed for the 1993–94 school year and the school years thereafter, making claims arising from these refusals timely and actionable. *See Equal Employment Opportunity Comm'n v. Alliant Techsystems, Inc.*, 1998 WL 777015, at *4–5 (W.D.Va.1998) (negotiations over possible religious accommodations tolled statute of limitations until employer "finally and irrevocably denied" employee's request for accommodation).

■ The claims arising from O'Brien's suspension without pay are independently actionable from his claims regarding the refusal to accommodate him. Besides deciding against accommodating O'Brien (an adverse employment action in and of itself), the SEA had to take an additional step of invoking contractual sanctions under the collective bargaining agreement by requesting the superintendent suspend O'Brien. *See, e.g.,* Collins Aff. (Doc. No. 19), Exh. H (Letter from SEA President Linda C. Wilson to Superintendent Peter Negroni of 6/15/95) (requesting O'Brien to be suspended pursuant to Art. 24, § A of the teacher's contract). It was then Superintendent Negroni who took the affirmative step of suspending O'Brien, thus giving rise to O'Brien's claim against the City of Springfield.

Moreover, these claims are timely, since ... to trigger the statute of limitations, [the plaintiff] needed to have received notice, not only of the [suspension] decision, but also that the decision was *final and that it would be followed by no further process.* To alert [the plaintiff] to the accrual of his claims, this notice would need to be *unequivocal, and communicated in a manner such that no reasonable person could think there might be a retreat or change in position prior to the ... employment decision.*

*Hoesterey v. City of Cathedral City,* 945 F.2d 317, 320 (9th Cir.1991) (emphasis added), *quoted in Angeles–Sanchez v. Alvarado,* 993 F.2d 1530 (1st Cir.1993) (unpublished decision). Here, the record shows that the request for suspension and the suspension itself were not inevitable but were placed on hold and would have been completely rescinded had the parties successfully completed their negotiations regarding an accommodation. Thus, the claims related to the suspension did not accrue until O'Brien was actually suspended, on November 13, 1997. *See Hoesterey,* 945 F.2d at 320. O'Brien filed his MCAD Complaint within one month, rendering the claims related to the suspension timely.

## C. *Religious Discrimination Claims*

█ Title VII prohibits employers and labor unions from discriminating against an individual on the basis of religion "with respect to [the individual's] compensation, terms, conditions, or privileges of employment." [11] 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case that the defendants discriminated against the plaintiff on the basis of religion by failing to accommodate him, the plaintiff must show that (1) he sincerely possessed a bona fide religious belief that conflicted with an employment requirement, (2) he informed the defendants of the conflict, and (3) the defendants took an adverse employment decision against him for his failure to fulfill the employment requirement because of his conflicting religious belief. *See Union Independiente,* 279 F.3d at 55; *Hall v. Baptist Mem'l Health Care Corp.,* 215 F.3d 618, 627 (6th Cir.2000).

If the plaintiff can make these showings, then the burden shifts to the defendants to show either (1) that they made a reasonable accommodation of the religious practice, or (2) that any accommodation would result in undue hardship on the conduct of the defendants' businesses or on the plaintiff's co-workers. [12] *See Union Independiente,* 279 F.3d at 55; *Opuku–Boateng v. State of California,* 95 F.3d 1461, 1468 (9th Cir.1996). *Cf. Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481, 1487–88 (10th Cir.1989) ("[I]t is certainly conceivable that particular jobs may be completely incompatible with particular religious practices. It would be unfair to require employers faced with such irreconcilable conflicts to attempt futilely to resolve them."); *Yott v. N. Am. Rockwell Corp.,* 602 F.2d 904 (9th Cir.1979) (employee's religious beliefs—that Christians cannot join or financially support unions nor be made to contribute to charitable causes involuntarily—precluded employer whose workforce was about to become completely unionized from being capable of offering any type of reasonable accommodation that would impose no undue hardship).

### 1. *Prima Facie Case*

"The requirement that the employee have a 'bona fide religious belief' is an

---

**11.** Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

While the language of Title VII appears to apply only to employers, "courts have uniformly imposed upon labor organizations the same duty to provide reasonable accommoda-

tions." *Union Independiente,* 279 F.3d at 55 n. 7.

**12.** While the facts may support a claim under the disparate treatment theory—since the only Roman Catholic offered a religious accommodation was retiring and is therefore, arguably dissimilarly situated to O'Brien—the plaintiff has hinted at this theory without actually arguing it. The defendants do not seriously address this theory either, so the Court has no occasion to consider it.

essential element of a religious accommodation claim." *Union Independiente*, 279 F.3d at 55–56. Thus, the plaintiff must show that (1) the belief or practice is religious, and (2) he holds the belief or practice sincerely. *See id.* at 56. "Religious beliefs protected by Title VII need not be acceptable, logical, consistent or comprehensible to others." *Id.* at 56 (internal quotations omitted).

O'Brien proclaims that he is "a devout Roman Catholic[ who] oppose[s] abortion, birth control, and teenagers having premarital sex. [His] religious convictions and abhorrence of these tenets makes it morally impossible for [him] to give financial support to any agency that supports such activity." [13] *See* O'Brien Aff. at ¶ 1. Unlike the Roman Catholic objector in *Univ. of Detroit*, O'Brien does not explicitly object to being "associated" with an organization that promotes these values, *see* 904 F.2d at 333, even though "financially supporting" and "being associated with" such an organization are likely the same thing.

The defendants do not now challenge the sincerity of O'Brien's convictions, nor do they challenge whether his beliefs are actually part of the Roman Catholic doctrine. *See* Defs.' Mem. In Supp. (Doc. No. 17), at 17. Nor can the defendants challenge that O'Brien informed them of the conflict between his religious beliefs and the union requirements, *see, e.g.,* Collins Aff. (Doc. No. 19), Exh. D (Letter from

O'Brien to SEA President Linda C. Wilson of 1/19/95), or that they took an adverse employment action against O'Brien by refusing to accommodate him and by requesting and actually suspending him because of his conflicting religious beliefs, *see, e.g., id.,* Exh. H (Letter from SEA President Linda C. Wilson to O'Brien of 6/15/95). Thus, O'Brien has satisfied his prime facie case of religious employment discrimination, and the burden now shifts to the defendants. *See Union Independiente*, 279 F.3d at 55.

### 2. *Reasonable Accommodation*

The defendants assert that they already satisfied their burden of proposing reasonable accommodations. First, the defendants cite the Supreme Court's decision in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), to argue that the agency service fee is, in and of itself, a reasonable accommodation. Next, the defendants argue that O'Brien unreasonably rejected their three proposals of accommodation.

### a. *The Agency Service Fee as Reasonable Per Se*

### i. *Applicability of Abood*

The defendants maintain that *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, grants them an unrestricted license to collect an agency ser-

---

**13.** O'Brien articulates his beliefs in other ways as well. He proclaims that, "As a Roman Catholic, I do not give my money to any organization that supports and endorses the right of people to destroy unborn children." *See* Defs.' Exhs. (Doc. No. 19), Exh. D (Letter From O'Brien to SEA President Linda C. Wilson of 1/19/95).

While the defendants interpret O'Brien's beliefs to mean that "his personal religious commitment precludes him from associating with any organization that takes positions in-

imical to Roman Catholic doctrine," *see* Mem. (Doc. No. 17), at 17 n. 3; *see also* Defs.' Exhs. (Doc. No. 19), Exh. F (Letter From O'Brien to Springfield School Department Attorney Brian J. McCook of 3/8/95) ("Catholicism has always historically supported it's [sic] members from financially supporting any organization, labor or otherwise, that clearly violates it's [sic] religious tenets."), the Court is only concerned with the specific beliefs relevant to this case.

vice fee from a religious objector, thus making such an accommodation reasonable *per se*. The Court dismisses this argument out of hand.

■ Clearly, O'Brien cannot be forced to join a union or to outlay funds that the unions would use to champion political or ideological causes to which he objects. *See Abood,* 431 U.S. at 235–36, 97 S.Ct. 1782. "The fact that [O'Brien would be] compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement" on his First Amendment rights. *Id.* at 234, 97 S.Ct. 1782. A union can, however, impose agency service fees upon nonmembers to cover their proportional share of the costs associated with collective bargaining, contract administration, and grievance adjustment without offending the nonmembers' First Amendment rights. *See* 431 U.S. at 225–26, 97 S.Ct. 1782. The vital role the union plays as an exclusive bargaining agent, the necessity to distribute costs of collective bargaining equally among employees benefiting therefrom, and the desirability of avoiding "free riders" justify the constitutional intrusion. *See id.* at 222–23, 97 S.Ct. 1782.

In light of this framework, had O'Brien objected only to having his payments to the SEA used for pro-abortion and pro-condom distribution purposes, then assessing a fair share fee (as opposed to full dues) against him would very well be a reasonable accommodation under the *Abood* line of cases and Title VII. *See id.* at 235–36, 97 S.Ct. 1782. This is not O'Brien's only religious objection, however: He also objects to financially supporting an organization that champions these causes, an issue the Supreme Court has yet to consider and one that falls squarely within the bounds of Title VII. *See Nottelson v. Smith Steel Workers D.A.L.U. 19806,* 643 F.2d 445, 452 n. 8 (7th Cir.1981)

(holding that assessing an agency service fee against an employee whose "religious objection is to providing financial support to a labor organization" is a proposal that "can hardly be deemed an accommodation, much less reasonable"). This distinction is not a matter of mere semantics or artful pleading, but a matter of genuine importance which invokes the language and purpose underlying Title VII. Accordingly, this case concerns statutory not constitutional rights, and *Abood* and its progeny hold no more than background relevance to this case. With this in mind, the Court will proceed to analyze under Title VII whether the fair share fee in and of itself is a reasonable accommodation.

ii. *The Reasonableness of the Agency Service Fee*

■ The reasonableness of an accommodation is inherently a question of fact. *See Equal Employment Opportunity Comm'n v. Universal Mfg. Corp.,* 914 F.2d 71, 73–74 (5th Cir.1990). "The duty to accommodate cannot be defined without reference to the specific religious belief at issue." *Univ. of Detroit,* 904 F.2d at 335. Moreover, for an accommodation to be reasonable, it must address the entirety of O'Brien's religious objections; "selective 'accommodation,'" where the employer accommodates one of the employee's objections but completely ignores the rest of the employee's objections, is "patently unreasonable." *Universal Mfg. Corp.,* 914 F.2d at 73. *See also Univ. of Detroit,* 904 F.2d at 335 (recognizing that employee's religious beliefs prohibited him from directly contributing money to a union and from associating with the union); *Equal Employment Opportunity Comm'n v. Am. Fed'n of State, County and Mun. Employees,* 937 F.Supp. 166, 168 (N.D.N.Y.1996) (bifurcating employee's objections into "one of supporting *particular issues* with

which he is religiously at odds, and the other of supporting an *organization* that champions these issues") (emphasis added).

■ In this case, O'Brien objects both to the union using his money for political causes (i.e., pro-choice and pro-condom distribution) that conflict with his Roman Catholic beliefs and to his being forced to financially support any organization that promotes those causes. Imposing a fair share fee is a patently unreasonable accommodation in this case, since, *inter alia,* the SEA passes along a portion of the agency service fee to the MTA and the NEA. As already discussed, those two unions directly promote causes which are antithetical to O'Brien's religious beliefs, and using O'Brien's funds to champion those causes is no accommodation at all. Thus, the Court will deny the defendants' motion for summary judgment on that ground, and will next consider the reasonableness of the defendants' three other offers of accommodation.

b. *The Reasonableness of the Three Offers of Accommodation*

■ Some of the plaintiffs' objections to the three offers of accommodation, whatever sympathetic value they contribute to his case, are superfluous in the Court's analysis. These objections—that the SEA included a confidentiality clause in the second proposed settlement agreement despite the publicity generated in this case, that the SEA allegedly misrepresented facts before the MCAD, that the SEA allegedly delayed the negotiations, and that the SEA allegedly exercised bad faith throughout this ordeal—have no bearing on whether the proposed accommodation was reasonable in light of O'Brien's specific religious objections. O'Brien is not entitled to any specific accommodation of his religious beliefs, only a

reasonable one. *See Univ. of Detroit,* 904 F.2d at 334. Put another way, Title VII does not require the defendants to accommodate O'Brien in a manner of his choosing, since such a scheme would incite him "to hold out for the most beneficial accommodation despite the fact that [the defendants may have already offered him] a reasonable resolution of the conflict." *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986) ("By its very terms [Title VII] directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation."). Rather, O'Brien has a duty to make a good faith effort to satisfy his objections via any reasonable accommodation that the defendants offer. *See Philbrook,* 479 U.S. at 69, 107 S.Ct. 367 ("Bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business.") (internal quotations omitted); *Lee v. ABF Freight Sys., Inc.,* 22 F.3d 1019 (10th Cir.1994). Where O'Brien "will not attempt to accommodate his own beliefs through the means already available to him or cooperate with his employer in its conciliatory efforts, he may forgo the right to have his beliefs accommodated." *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1286 (8th Cir.1977). Nonetheless, upon review of the three proposed offers of accommodation, each suffers from a fatal defect.

i. *The First Offer of Accommodation*

■ The first offer required O'Brien to pay an amount equal to full union dues to the SEA, which agreed it would not remit any of the funds to the MTA or to the NEA. This offer fell short of reasonably accommodating O'Brien's conflicting religious beliefs for numerous reasons. Fore-

most, there remains a genuine issue of material fact regarding whether the SEA actually promoted condom distribution policies. The defendants maintain that the SEA does not take an official position on the issues to which O'Brien objects, *see, e.g.,* Complaint (Doc. No. 1), at ¶ 19 ("The SEA takes no official position on the issues of abortion and condom distribution, but supports [the MTA and the NEA] with agency fees and attendance at conventions."). *See Univ. of Detroit,* 904 F.2d at 335 (recommending as a reasonable accommodation that plaintiff pay an agency service fee to the local union "to be used solely for local collective bargaining purposes" where local union took no official position on the issue of abortion). Whether the SEA *officially* promotes these policies, however, is not entirely instructive in this case. O'Brien has repeatedly maintained in communications with the defendants that in 1987, the SEA President voted in support of condom distribution in school, *see* Collins Aff. (Doc. No. 19), Exhs. D (Letter from O'Brien to SEA President Linda C. Wilson of 1/19/95) and F (Letter from O'Brien to Springfield School Department Attorney Brian J. McCook of 3/8/95). *Compare Univ. of Detroit,* 904 F.2d 331 (where plaintiff presented no evidence that local union actually promoted pro-abortion policies on any occasion). The defendants have not offered voting records of the SEA delegation to contradict this assertion nor have they attacked the basis for O'Brien's specific assertion with more than a general denial that the SEA harbors no "official" position on the issue. As such, the Court must view this evidence as showing that the SEA supported a cause to which O'Brien objected. *See Feliciano de la Cruz,* 218 F.3d at 5.

Moreover, restricting the use of O'Brien's payment to the local union is merely a form of accounting legerdemain that fails to resolve O'Brien's substantive objections. *See Abood,* 431 U.S. at 238 n. 35, 97 S.Ct. 1782. If O'Brien's payment was used only to fund the SEA for its collective bargaining expenses, it would merely free up a portion of another member's payment to be used to fund the MTA and the NEA for their activities, in effect, subsiding the very causes to which O'Brien objects. *See id.; but see Univ. of Detroit,* 904 F.2d at 335. A more tangible and immediate concern is that . . .

> [m]erely reallocating the fees collected would not be a real solution in the current action, as it would only reallocate the utilization of funds by the organization. *This would not address [the employee's] objection to supporting the organization itself.* It is only through redirecting the funds *entirely* that [the employee's] religious objections are fully met.

*Am. Fed'n,* 937 F.Supp. at 168 (citations omitted) (emphasis added).

Also problematic, the SEA's offer required O'Brien to pay the full union dues amount, which is an amount greater than what a non-union member is legally obligated to pay. *See* Mass. Gen. Laws ch. 150E, § 12; Mass. Regs. Code tit. 456, § 17.04. Granted, if O'Brien contributes the full dues amount to charity, the union will not use any of it for non-chargeable expenses unrelated to collective bargaining, contract administration, or grievance adjustment, since the union will receive none of it at all. A union, however, is not entitled to charge whatever amount it wishes to someone making a charitable substitution: At most, the union can levy an amount only equal to the agency service fee, even if none of the fee ends up paying for agency services. *See* Mass. Regs. Code tit. 456, § 17.04–17.06. This Court now concludes that any demand of a non-union member at the full dues level (as opposed

to the agency service fee) is a *per se* unreasonable accommodation.

### ii. *The Second and Third Offers of Accommodation*

■ The SEA presented O'Brien with its second and third offers of accommodation only after O'Brien filed a complaint with the MCAD on December 6, 1995. These offers of accommodation are unreasonable as a matter of law. In a well reasoned opinion drawing on the language, purpose, and policies underlying Title VII, the Tenth Circuit held that an employer's settlement offer made during the pendency of an administrative proceeding on a claim of religious discrimination that was contingent upon the employee dropping his discrimination charges was an unreasonable accommodation. *See Toledo*, 892 F.2d at 1487–88. This Court agrees that embracing a contrary rule would encourage the defendants "to adopt a wait-and-see attitude towards employees with problematic religious practices," by first refusing to accommodate the employee and then attempting to accommodate the employee only when administrative charges loom overhead. *Id.* at 1487. It would be inequitable to allow the defendants in this case to be absolved from liability simply by proposing a settlement *after* they had already taken allegedly illegal adverse employments actions to O'Brien's detriment. *See id.* at 1487–88.

■ Notwithstanding this rule, the last two offers of accommodation are substantively unreasonable as well. Once again, the amount O'Brien was required to pay under the SEA's second proposal was set at the full dues, rather than the agency service fee, level. Moreover, the agreement appears to require O'Brien to pay dues directly to the SEA before those funds would be released to charity. In pragmatic terms, the SEA obtains a temporary, "involuntary loan for purposes to which [O'Brien] objects," *Ellis v. Bhd. of Ry., Airline and S.S. Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), rendering this accommodation unreasonable as well.

Moreover, the SEA was also allowed to retain all of the money held in escrow under the proposal. That the Court will enter summary judgment for the defendants on most of the claims stemming from the funds placed into escrow is of little consequence, since there remain actionable, timely claims relating to the 1993–94 school year funds (and the funds corresponding to the school years thereafter) that were placed in escrow. That O'Brien ultimately lost those claims on a technicality (i.e., on statute of limitations grounds) rather than on the substantive merits also buoy this conclusion. Once again, the second offer of accommodation falls short of satisfying O'Brien's complete religious objections.

■ The third and final offer of accommodation fairs no better. Once again, the SEA demanded future payments at the dues level. The SEA also escaped any financial liability for O'Brien's suspension by allowing him to recoup those costs, as well as costs for attorney's fees, from the money he deposited into escrow. O'Brien considered the funds he paid into escrow as earmarked for charity, and although he eventually lost his claim to some of those funds due to the statute of limitations, at least some of those funds (namely, the funds associated with the agency fees for the 1993–94 school year and beyond) remain the basis for timely actions in this Court. As such, offering these funds to O'Brien in payment for his unjustified suspension contravenes the intent underlying his religious objections, since some of his money would be used to satisfy the SEA's financial obligations under the agreement.

O'Brien reasonably rejected this accommodation as well. Thus, the Court will deny the defendant's motion for summary judgment on these grounds.

#### c. *Undue Hardship*

 Having failed to demonstrate that the SEA offered O'Brien a reasonable accommodation, to prevail on their motion the defendants must now show that any accommodation would result in undue hardship. *See Union Independiente*, 279 F.3d at 55; *Opuku–Boateng*, 95 F.3d at 1468. Whether an accommodation would impose a hardship that is undue is an issue of fact. *See Universal Mfg. Corp.*, 914 F.2d at 74; *Nottelson*, 643 F.2d at 452. An accommodation imposes an undue hardship when it most imposes more than a *de minimus* cost. *See Trans World Airlines v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). O'Brien argues that allowing him to contribute an amount equal to the agency service fee to a mutually agreeable charity would not impose an undue hardship upon the defendants or on O'Brien's co-workers. The defendants simply fail to offer quantitative evidence to dispute this assertion.

The defendants argue that "O'Brien's requested accommodation would impose a substantial cumulative cost on the SEA; will burden other Springfield teachers with the full cost of representing him; and will have an insidious effect on the SEA's bargaining unit." Mem. In. Supp. (Doc. No. 17), at 23. Citing numerous cases in which courts found charitable substitution (in lieu of paying full dues or agency service fees directly to the union) to impose no undue hardship on the union or the plaintiff's coworkers, the defendants argue those courts ignored valid, logically extended arguments. *See generally McDaniel v. Essex Int'l. Inc.*, 696 F.2d 34 (6th Cir.1982); *Tooley v. Martin–Marietta Corp.*, 648 F.2d

1239 (9th Cir.1981); *Nottelson*, 643 F.2d 445; *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir.1978); *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397 (9th Cir.1978). The defendants criticize these decisions on the grounds that the courts ignored the existence of "free riders," the cumulative costs and effects of permanently exempting employees from paying the fee, and the costs disproportionately imposed on other teachers. The defendants also maintain that other teachers are likely to follow O'Brien's footsteps, given the number of fee objectors, which ranges between 19 and 35 teachers per year.

The defendants concede that many of these decisions rested upon the unions' failure to offer quantifiable proof as to the exact effects of an accommodation, but complain that because Massachusetts fee objectors need only raise a general objection at the time they bring their charges, *see Sch. Comm. of Greenfield v. Greenfield Educ. Ass'n*, 385 Mass. 70, 431 N.E.2d 180, 185 at n. 3; *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 306 n. 16, 106 S.Ct. 1066, 89 L.Ed.2d 232, it is impossible for the SEA to determine whether any objectors are religious objectors.

The defendant's arguments completely miss the mark. First, O'Brien seeks different, not preferential, treatment. *See Tooley*, 648 F.2d at 1243 ("Disparate treatment of employees ... is not necessarily unreasonable."); *Opuku–Boateng*, 95 F.3d at 1468 n. 12, 1469–70 n. 14 (construing cases where courts found preferential rather than different treatment imposed undue hardship upon plaintiff's co-workers). O'Brien remains fully willing to pay an amount equivalent to the agency service fee and does not now challenge the specific expenditures included within that fee; rather, he challenges to what organization his payment goes. In the end, he must

pay the same amount out of his pocket as all other employees, and a "substituted charity accommodation does not result in preferential treatment between employees." *Tooley,* 648 F.2d at 1243. That O'Brien's payment is redirected to a charity does not make him a "free rider," *see Am. Fed'n,* 937 F.Supp. at 169, since he "suffer[s] the same economic loss as the union member employees," *Tooley,* 648 F.2d at 1243–44. In other words:

> Because a religious objector under a charity-substitute accommodation bears the same financial burden as his co-workers, he is not, as the [defendants suggest], a 'free rider' seeking something for nothing, and the diversion of his contribution to a charity rather than the Union does not of itself make the accommodation unfair or unreasonable as a matter of law.

*Nottelson,* 643 F.2d at 451. O'Brien's willingness to incur some cost to himself distinguishes this case from *Yott,* where the plaintiff argued, *inter alia,* that his religious beliefs required complete exemption from having to pay any dues, agency service fees, or charitable substitutions. *See Yott,* 602 F.2d at 909. In *Yott,* the Ninth Circuit found the plaintiff's proposed accommodation to be unreasonable because it resulted in preferential treatment among employees. *See id.* ("exemption on its face requires such a substantial alteration in the relationship between the parties and significant erosion of the congressional purpose in permitting union security clauses that it goes beyond reasonable accommodation"). That is simply not the case here.

Moreover, the defendants have consecrated nothing more than pure conjecture regarding what secondary effects, if any, might be caused by accommodating O'Brien in this manner. *Compare id.* ("this is not a situation where no evidence

has been submitted that there has been or is dissension among employees because some are paying the equivalent of union dues to a charity"). "The loss of one employee's dues ... does not inflict undue hardship on a union," *Int'l Ass'n of Machinists & Aerospace Workers,* 833 F.2d 165, 168 (9th Cir.1987), although many other avenues remain open for the defendants to show an undue hardship. For instance, the defendants may show that granting the accommodation would result in: (1) specific financial injury to the unions that is more than *de minimus, see Nottelson,* 643 F.2d at 452; (2) widespread refusal to pay dues, *see Burns,* 589 F.2d at 407; *Tooley,* 648 F.2d at 1243–44; (3) numerous other teachers seeking an accommodation, *see Nottelson,* 643 F.2d at 452, or expressing dissatisfaction with the arrangement, *see Burns,* 589 F.2d at 406–07; or (4) an increase dues for other members beyond a *de minimus* amount, *see Nottelson,* 643 F.2d at 452; *Burns,* 589 F.2d at 407 (holding that a 24 cent increase in the fees assessed to non-religious objectors to be a *de minimus* amount). Unfortunately for the defendants, they have failed to satisfy their evidentiary burden here.

Their choice to accommodate Mr. Savoy because he is a Seventh Day Adventist also works against the defendants. Viewing the evidence in the summary judgment record, any hardship imposed upon the unions when O'Brien donates his agency service fees to charity is no more undue than when Mr. Savoy does the same. While the defendants attempt to distinguish Mr. Savoy's situation by arguing that Mr. Savoy is a Seventh Day Adventist whose religion specifically prevents him from joining a labor union, this is a distinction without a difference. *See Univ. of Detroit,* 904 F.2d at 335 ("The fact that [the plaintiff] does no harbor a *per se* religious objection to labor unions is not dispositive."). O'Brien's objection is es-

sentially the same objection Mr. Savoy fosters.[14]

▮▮▮ The defendants also protest that this result forces them to accommodate O'Brien's religious objections without being able to accommodate someone with equally secular views. This argument ignores that courts construe the term "religion" under Title VII to include the "principle of supremacy of conscience." *Nottelson*, 643 F.2d at 454 (*quoting Gillette v. United States*, 401 U.S. 437, 453, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)). Moreover, "Title VII does not mandate an employer or labor organization to accommodate what amounts to a 'purely personal preference.'" *Union Independiente*, 279 F.3d at 56 (*quoting Vetter v. Farmland Indus., Inc.* 120 F.3d 749, 751 (8th Cir.1997)). Any establishment clause concerns that the defendants raise are likewise inapposite. *See, e.g., Nottelson*, 643 F.2d at 453–55 (upholding the constitutionality of Title VII's definition of religion under the test expounded in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

As such, the defendants have failed on their quest to show an undue hardship, and summary judgment has eluded them on these grounds.

## V. CONCLUSION

For the reasons previously mentioned, the Court GRANTS IN PART and DENIES IN PART the defendants' motions for summary judgment (Doc. Nos.16, 31). As such, the claims arising from O'Brien's 1995 suspension, as well as the claims arising from the unions' refusal to accommodate him reasonably during the 1993–94 school years and the school years thereafter, will proceed to trial unless the parties agree to settle their disputes beforehand.

It is So Ordered.

---

14. The Court notes that, in the future, another reasonable accommodation might include the SEA agreeing to refrain from having any of its delegates who attend the MTA and the NEA conventions vote (one way or the other) on any controversial policy matter unrelated to collective bargaining, contract administration, or grievance adjustments. Of course, undertaking this accommodation might involve a significant policy shift that local unions would have to undertake after considering what course of action is in the best interests of its members.